[Crim. No. 16296. Second Dist., Div. Four. Sept. 29, 1969.]

THE PEOPLE, Plaintiff and Respondent, v. HAROLD ELLIOTT HAYES, Defendant and Appellant.

Harold Elliott Hayes, in pro. per., and Donald F. Roeschke, under appointment by the Court of Appeal, for Defendant and Appellant.

Thomas C. Lynch, Attorney General, William E. James, Assistant Attorney General, and Howard J. Schwab, Deputy Attorney General, for Plaintiff and Respondent.

JEFFERSON, J.—Defendant was found guilty of murder in the first degree and the jury fixed the penalty at life imprisonment. This is an appeal from the judgment.

After having drinks at several bars, the victim James Anderson and his friend William Gillard went to a local shoeshine parlor noted for its gambling activities. It was late in the afternoon. Defendant was there along with some others. Anderson gave defendant some money to go buy beer. Anderson, a prosperous business man, had been paid $300 in cash earlier that day by a tenant of one of the houses he owned. He put the bills in his money clip along with a $20 bill and some other bills which he then had. After carrying on a friendly conversation with defendant and the others for about an hour, Anderson and Gillard left accompanied by defendant. They got into Anderson's Cadillac and Gillard drove them to a woman's house where they visited for a time. Both Anderson and Gillard were then "pretty well drunk." When they left Anderson asked Gillard to drive defendant home and then to drop him off. Instead Gillard drove to his own house and said he was in no shape to drive any further. They all went in and talked to Mrs. Gillard and a neighbor. Anderson then appeared "really drunk." Defendant, however, looked "pretty sober." Anderson left with defendant at about 9 p.m. A short time later they stopped at a service station for gas. The attendant observed that defendant and Anderson were the only persons in the Cadillac and that defendant was driving.

Anderson was found dead the next morning. He was slumped in the passenger seat of his parked and locked Cadillac. He had been shot seven times, once in the side of the

head. On the floorboard near the body the investigating officer found Anderson's money clip. There was no money in it or on his person. Fragments of what later examinations revealed was part of a $20 bill were found on the money clip which was also coated with blood. The keys to the car were found in a gutter across the street from where the car was parked. Blood tests on the body revealed that the victim was intoxicated at the time of his death.

Defendant was arrested the next day. He was inside the shoeshine parlor when a squad of officers, some uniformed, arrived. When he observed the officers, defendant made a quick furtive movement with his right hand and removed a revolver from his waistband. He threw the gun behind a door. The officers retrieved it and found that it was fully loaded with seven rounds of .32 caliber ammunition. Later tests determined that the revolver was the murder weapon. Defendant had $24 in his pocket. His jacket had blood on it. His fingerprints were found on the steering wheel of the victim's Cadillac.

Defendant testified that he was 20 years old. About a month before the shooting he was kicked in the head during a fight. Since that time he suffered dizzy spells and had a ringing in his head. He also heard voices calling his name. On the day of the shooting he went to the shoeshine parlor. He smoked marijuana and drank wine and beer. He met Anderson and Gillard and they left together. They drove in Anderson's car to a bar where he had a beer and a "red devil" for the pain in his head. They then went to a liquor store and he used his own money along with $4 Anderson gave him, which was all the money Anderson had, to purchase a bottle of liquor. They then went to a woman's house where he had some of the liquor. He also had another "red devil" and smoked some marijuana. By then he was "high." After dropping Gillard off, he drove Anderson to the gas station. They had to use Anderson's credit card because Anderson was out of money. Anderson showed him his empty money clip. They then drove to another bar and had another beer which he paid for. He had a bad pain in his head at this time and his ears were ringing. When they left the bar Anderson drove. He told Anderson his address and Anderson said he would drive him home. He then fell asleep in the front passenger seat. When he awoke the car was moving in a direction away from his home and he saw that Anderson had a gun in his hand pointing at him. Anderson told him to relax and be quiet. After

driving on for a short distance the car suddenly jerked giving him a chance to grab the gun.

He then ordered Anderson to stop the car and he took over the wheel. He began driving and at the same time holding the gun on Anderson. Just before he reached Glenoaks Boulevard Anderson made an attempt to grab the gun. He was afraid Anderson would do something to him if he got hold of it and, when Anderson reached for it, he squeezed the trigger. He kept on squeezing the trigger and shooting at Anderson because Anderson kept attempting to take the gun away from him. During this time the car was still moving. When Anderson finally slumped over he continued to drive on until he came to Rincon Street where he parked the car and locked it. He threw the keys away and put the gun in his waistband. He then walked to Van Nuys Boulevard, turned left and walked over to Laurel Canyon Boulevard. He bought a candy bar at a liquor store there and then entered the Lion's Den bar where he had a couple more drinks. The next day he secured more bullets for the gun and kept it on him because of the "guys" who beat him up the month before. When he saw the officers at the shoeshine parlor, on an impulse he threw the gun away. He was not thinking about Anderson at the time and did not know the officers were there to arrest him for killing Anderson. He won the money he had on his person gambling at the shoeshine parlor.

Defendant's mother and girl friend corroborated his testimony about his previous head injury and that he was using narcotics and acting strangely. Other witnesses corroborated defendant's testimony that he was high on alcohol and narcotics on the evening of the killing.

In rebuttal two psychiatrists, who examined defendant after his arrest, both testified that in their opinion he had the capacity to form the specific intent required to commit the crime of robbery, and the capacity to premeditate, deliberate and harbor malice with respect to the crime of murder. They found defendant to be of average intelligence and not suffering from any mental illness. Defendant never told them that he had suffered a head injury and they found no evidence of such an injury.

Defendant maintains that, because he raised the defense of diminished mental capacity, the court below erred in not giving an instruction on nonstatutory involuntary manslaughter. Such an instruction is required only where the defendant introduces evidence "deserving of consideration,"

that at the time of the commission of the crime, he was unᵣconscious due to intoxication from drugs or alcohol voluntarily consumed. (*People* v. *Graham,* 71 Cal.2d 303, 316 [78 Cal.Rptr. 217, 455 P.2d 153]; see also *People* v. *Conley,* 64 Cal.2d 310, 324-326, fn. 4 [49 Cal.Rptr. 815, 411 P.2d 911].) Defendant's finely detailed testimonial account of what transpired dispels any possible argument that he was unconscious at the time of the killing. The record shows that the court fully and properly instructed the jury concerning the defense of diminished capacity as it relates to reduce murder to voluntary manslaughter and to reduce first degree murder to murder in the second degree.

 During the course of his testimony defendant stated that due to jail procedures he was only able to obtain about one hour of sleep each night during the trial; that, because of lack of sleep, he was not able to completely follow the testimony given; he was actually asleep during the testimony of one of the psychiatrists. Defendant asserts that this evidence indicates he was denied his constitutional right to be present both physically and mentally during the whole of his trial. He further asserts that the court should have conducted an independent hearing to ascertain whether he possessed the required mental presence to continue with the trial.

Regarding defendant's testimony, the court, in a discussion with counsel prior to instructing the jury, commented: "I just want the record to show that the court, of course, was in the courtroom during the entire procedure when the testimony was being taken and looked directly at the counsel table, and at no time while peering in the direction of the counsel table, when I was looking in that direction, did I see the defendant with his eyes closed or in what appeared to be a sleeping condition. If I had seen that I would have immediately, of course, called it to his counsel's attention." The court then asked defense counsel if he had anything to say concerning the matter, and counsel answered in the negative.

No additional hearing on the question of defendant's mental presence was called for. The trial judge, who was in a position to observe defendant throughout the trial, did not observe him sleeping. Apparently, neither did defendant's counsel, for he made no comment on the court's observation and sought no further hearing on the matter. As indicated, the only evidence of defendant's sleepless condition was his own unsupported testimony. Under the circumstances, the trial court was fully warranted in disbelieving him.

Lastly, defendant, who is a Negro, argues that because there were no Negroes on the panel of prospective jurors, he was denied equal protection under the law. Defendant concedes that he has no evidence of a systematical exclusion of Negroes from the jury panel for the County of Los Angeles. He argues, however, that because of the large percentage of Negroes in the county, the fact that there was not one Negro on his panel, indicates discrimination.

■ "A person on trial for an alleged crime is not necessarily entitled to have persons of his own race on the jury, nor is he deprived of vested rights or of a fair and impartial trial merely because the jury contains no persons of his own race, provided such individuals have not been deliberately or arbitrarily excluded therefrom. [Citations.]" (*People* v. *Jackson*, 88 Cal.App.2d 747, 751 [199 P.2d 322].) ■ It is the established rule that a challenge to the jury panel "must be sustained upon a showing of systematic exclusion. . . ." (*People* v. *Frye*, 218 Cal.App.2d 799, 802 [32 Cal.Rptr. 699]; see also *People* v. *Hines*, 12 Cal.2d 535 [86 P.2d 92].) As defendant admits, such a showing is not made here.

The judgment is affirmed.

Files, P. J., and Kingsley, J., concurred.

Appellant's petition for a hearing by the Supreme Court was denied November 26, 1969.