[Crim. No. 18380. In Bank. Apr. 17, 1975.]

THE PEOPLE, Plaintiff and Respondent, v.
HOMER LAWRENCE RAY, JR., Defendant and Appellant.

## COUNSEL

James Jay Seltzer, under appointment by the Supreme Court, for Defendant and Appellant.

Evelle J. Younger, Attorney General, Jack R. Winkler, Chief Assistant Attorney General, Edward P. O'Brien, Assistant Attorney General, Derald E. Granberg and Jean M. Bordon, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

**WRIGHT, C. J.**—Homer Lawrence Ray, Jr., appeals from a judgment upon a jury conviction of voluntary manslaughter (Pen. Code, § 192), a lesser included offense within that of murder (Pen. Code, § 187) as charged in the information.[1] Defendant contends that the trial court

---

[1]Unless otherwise expressly provided all statutory references are to sections of the Penal Code.

The jury also found that at the time of the commission of the offense defendant was armed with a deadly weapon. (See § 12022.) Defendant admitted the truth of an alleged prior conviction of a felony.

erred (1) in failing to instruct the jury, *sua sponte,* that involuntarily induced unconsciousness was a complete defense of the charge and (2) in failing to give a requested instruction on involuntary manslaughter in the context of defendant's defense of diminished capacity based on voluntary intoxication. Although we reject defendant's first contention we conclude that the second is meritorious and that the judgment, accordingly, must be reversed.

About noon on February 16, 1973, a dispute developed between defendant and Mrs. Laverne Short when he demanded the repayment of $5 which he had loaned to her and she claimed that her son, Charles Bell, had earlier repaid the money. Defendant and Charles Bell, the victim herein, next became embroiled in the argument and began fighting in the street. Bell, wearing heavy rings on his fingers, struck defendant about the face and caused him to lose consciousness. There was also evidence that in addition to striking defendant with his fists Bell struck him with a wine bottle. As a result of the encounter defendant's face was swollen and he bled from a wound near the right temple.

After defendant regained consciousness, he was helped to his car and was heard to remark that he was going to his home to secure a gun. He drove his car in a normal manner and proceeded to and entered his home. After treating his wounds defendant returned to his car and, according to the testimony of several witnesses, drove about seeking Bell while making threats to take the latter's life.

Mrs. Short testified that she had been present when defendant stopped his car while conducting his search and stated his intention to her to kill Bell. She thereafter advised her son of defendant's threats. Approximately four hours after the first altercation defendant drove slowly by Mrs. Short's home and Bell ran out into the street carrying a bayonet. He managed to enter the driver's side of the front seat of the car, threatening defendant with the bayonet as the two struggled on the front seat. During this encounter defendant was wounded about the face and was unable to use a gun then in his possession when the bullets and firing pin fell from the weapon. Defendant succeeded in getting out of the vehicle where the struggle continued but shortly thereafter ended, apparently, at Bell's suggestion. The antagonists shook hands and Bell retrieved and returned the bullets to defendant. Defendant reloaded the gun, reinserted the firing pin and fired two shots into Bell's head.[2]

---

[2]The foregoing account of the events leading up to and the actual shooting is consistent with testimony of the People's witnesses. Defendant, who testified in his own behalf, told a different version. (See *infra.*)

Defendant and others testified that he had taken a number of "reds" (secobarbital) during the day of the killing, and there was expert testimony to the effect that analysis of specimens taken from defendant on the day of the killing disclosed .15 milligrams percent of secobarbital in defendant's bloodstream.[3] According to the testimony of an expert witness such a drug level in conjunction with a concussion of the brain would result in difficulty in thought transmissions and in the formation of sound judgments. Several lay witnesses testified that defendant appeared dazed at the times of the encounters.

Defendant's contention that the court was required to instruct *sua sponte* on the defense of unconsciousness fails because of a complete absence of factual support in the record. ▇ "It is settled that in criminal cases, even in the absence of a request, the trial court must instruct on the general principles of law relevant to the issues raised by the evidence. [Citations.] The general principles of law governing the case are those principles closely and openly connected with the facts before the court, and which are necessary for the jury's understanding of the case." (*People* v. *St. Martin* (1970) 1 Cal.3d 524, 531 [83 Cal.Rptr. 166, 463 P.2d 390].) The duty to instruct *sua sponte* on general principles closely and openly connected with the facts of a case includes an obligation to instruct on the defense of involuntary unconsciousness but only when it appears that the defendant is relying on that defense, "or if there is substantial evidence supportive of such a defense and the defense is not inconsistent with the defendant's theory of the case." (*People* v. *Sedeno* (1974) 10 Cal.3d 703, 716 [112 Cal.Rptr. 1, 518 P.2d 913].)

Defendant did not rely on a defense of involuntary unconsciousness at trial and asserts it for the first time on appeal. When established, it is a complete defense to a criminal charge. (§ 26, subd. Five; *People* v. *Conley* (1966) 64 Cal.2d 310, 323-324 [49 Cal.Rptr. 815, 411 P.2d 911].) ▇ "An unconscious act within the contemplation of the Penal Code is one committed by a person who because of somnambulism, a blow on the head, or similar cause is not conscious of acting and whose act therefore cannot be deemed volitional. [Citation.]" (*People* v. *Sedeno, supra,* 10 Cal.3d 703, 717.) Defendant relies on evidence that four hours before the killing he had been rendered unconscious as the result of a beating by the victim and that during the altercation immediately preceding the killing the victim inflicted other wounds which, according

---

[3]The expert testified that the secobarbital level would produce an effect equivalent to a blood alcohol level of .20 to .25 percent.

to defendant, when combined with his previous wound, rendered him unconscious.

Although defendant sustained a severe beating which left him unconscious following his initial confrontation with the victim, it taxes the imagination to give any credence to his contention that he remained unconscious during the following four hours and until the time he fired two bullets into the victim's head. The evidence is undisputed that defendant regained consciousness and drove his car away from the scene. Although there is substantial evidence that he thereafter armed himself and sought to locate Bell for the purpose of killing him, such evidence is disputed. But even defendant's own testimony does not support his claims of continuing unconsciousness. He stated that he remembered very clearly the events leading up to the shooting. He testified to the drugs ingested both before and after the first confrontation. He further related that after recovering from the beating he had driven his car to a market while a friend obtained groceries; that he next drove to the friend's home where defendant washed his face; that he thereafter drove to another market; that when he was driving past Mrs. Short's home Bell ran out in front of the car, opened the door and began to struggle with defendant. There is no testimony from any witness other than defendant which even suggests that defendant was performing such activities while in an unconscious state. Testimony that he appeared dazed at times is entirely consistent with expert opinion that drugs ingested by defendant produced an intoxication which, together with the blows to his head, could have caused defendant to be "quite confused in a mental sense." No expert, however, testified that following the first altercation defendant thereafter continued to function in an unconscious state as a result of his experiences.

There is likewise no merit to the claim that defendant was unconscious as the result of wounds received in the second confrontation immediately prior to the killing. Bell, according to defendant, succeeded in inflicting lacerations as the result of pressing a bayonet against defendant. Defendant described this encounter as a "scuffle" during which he held off Bell's bayonet while Bell sought to twist defendant's gun from defendant's hand. No blows were struck and the scuffle ended when the bullets and the firing pin fell from defendant's gun and he slid out the passenger side of the car. Defendant described these events in sharp detail and he could not reasonably be deemed to have been rendered unconscious by these incidents. Defendant testified that the killing occurred after Bell had retrieved and returned the bullets to defendant

who thereafter found and inserted the firing pin; that at such time Bell again threatened defendant with the bayonet just as he was about to depart; and that defendant removed his gun from his pocket and fired twice because he was afraid Bell would kill him. Police officers who were on the scene almost immediately after the killing found defendant to be functioning normally.

■ We conclude that an instruction on involuntary unconsciousness was not required to be given *sua sponte* for the reason that defendant did not rely on that defense at trial and there was no "substantial evidence supportive of such a defense." (*People* v. *Sedeno, supra,* 10 Cal.3d 703, 716.) It appears, moreover, that such an instruction was not required for the further reason that it would have been inconsistent with the complete defense asserted at trial by defendant that he had killed only in self-defense in response to Bell's threat to kill him. *(Id.)*

■ Notwithstanding the absence of substantial evidence to support defendant's claim of unconsciousness, the refusal of the trial court to instruct on involuntary manslaughter in the context of diminished capacity eliminated an opportunity for defendant to have been found guilty of a crime not more serious than involuntary manslaughter. The jury was instructed inter alia on first degree murder, second degree murder and voluntary manslaughter. It was also instructed on diminished capacity as it related to those crimes.[4] It appears that instructions

---

[4]The pertinent instructions which were requested and refused were CALJIC No. 8.47 (Involuntary Manslaughter—Killing While Unconscious Due to Voluntary Intoxication) and No. 8.48 (Involuntary Manslaughter—Absence of Intent to Kill Due to Diminished Capacity, 1971 Revision). CALJIC No. 8.47 in the form submitted by defendant provided: "If you find that the defendant killed while unconscious as a result of voluntary intoxication and was therefore unable to form a specific intent to kill or to harbor malice, his killing is involuntary manslaughter.

"When a person voluntarily induces his own intoxication to the point of unconsciousness, he assumes the risk that while unconscious he will commit acts inherently dangerous to human life or safety. Under such circumstances, the law implies criminal negligence."

CALJIC No. 8.48, in the form submitted by defendant, provided: "Involuntary manslaughter is the unlawful killing of a human being without malice aforethought and without an intent to kill.

"A killing is unlawful within the meaning of this instruction if it occurred: (1) During the commission of a misdemeanor which is inherently dangerous to human life; or (2) In the commission of an act ordinarily lawful which involves a high degree of risk of death or great bodily harm, without due caution and circumspection.

"There is no malice aforethought and intent to kill if by reason of diminished capacity caused by mental illness, mental defect, *or* unconsciousness resulting from voluntary intoxication, the defendant did not have the mental capacity to harbor malice aforethought and to form an intent to kill." (Italics added.)

The court also refused to give the full CALJIC instruction on diminished capacity

on involuntary manslaughter were not given due to a misunderstanding reflected in current CALJIC instructions and some reported cases as to whether a state of unconsciousness is a necessary element to a finding of involuntary manslaughter in the context of diminished capacity based on intoxication. The trial court incorrectly concluded that such an instruction could be justified only when there was some evidence that the defendant was unconscious.[5]

The unlawful killing of a human being with malice aforethought is murder. (§ 187, subd. (a).) ■ If because of diminished capacity the perpetrator is unable to entertain malice but nevertheless is found to be able to form the intent to kill the crime is voluntary manslaughter. If because of his diminished capacity he additionally did not intend to kill, his crime, if any, is involuntary manslaughter. (*People* v. *Mosher* (1969) 1 Cal.3d 379, 391 [82 Cal.Rptr. 379, 461 P.2d 659].) ■ In *Mosher* we dealt with the nature of the mental state as it affected the intentions of the perpetrator of a homicide, and stated as follows: "Once facts are adduced which would constitute a basis for finding that defendant had both diminished capacity . . . , and also unconsciousness *or lack of the intent to kill,* the trial court fails in its duty to instruct the jury as to all issues of law raised by the evidence . . . if it does not supplement the statutory definition of involuntary manslaughter. *It must also instruct that if, due to diminished capacity the defendant had neither malice nor intent to kill, the offense could be no greater than involuntary manslaughter." (Id.;* italics added.)

■ The critical factor in distinguishing the degrees of a homicide is thus the perpetrator's mental state. If a diminished capacity renders him incapable of entertaining either malice or an intent to kill, then his offense is mitigated to a lesser crime. Although a finding that the perpetrator was unconscious would establish the ultimate facts that the perpetrator lacked both the ability to entertain malice and an intent to kill, the absence of either or both of such may nevertheless be found even though the perpetrator's mental state had *not* deteriorated into unconsciousness. ■ The emphasized portions of the foregoing quotation from *Mosher* make it clear that an instruction on involuntary

---

(CALJIC No. 8.77), omitting therefrom the following language: "Furthermore, if you find that his mental capacity was diminished to the extent that he neither harbored malice aforethought nor had an intent to kill at the time the alleged crime was committed, you cannot find him guilty of either murder or voluntary manslaughter."

[5]The trial court properly concluded that there was no evidence of unconsciousness, even voluntarily induced, and because it was of the view that such evidence was necessary to justify an instruction on involuntary manslaughter, refused to so instruct..

manslaughter is required if there is evidence that the accused is unable to entertain an intent to kill even though he has not lapsed into unconsciousness.[6]

In *People* v. *Roy* (1971) 18 Cal.App.3d 537 [95 Cal.Rptr. 884] (cert. den., 405 U.S. 976 [31 L.Ed.2d 251, 92 S.Ct. 1202]), the Court of Appeal purported to analyze the cases antedating *Mosher* and concluded that this court did not intend in *Mosher* to change the prevailing rule that to rebut the existence of an intent to kill and to reduce a homicide to involuntary manslaughter, a defendant's voluntary intoxication must reach the point of unconsciousness.[7] The *Roy* court depended on a direction in *Mosher* which required that if upon retrial "the evidence indicates that defendant was unconscious at the time of the offense due to voluntary intoxication, the trial judge should give this supplemental instruction on involuntary manslaughter." (*People* v. *Mosher, supra,* 1 Cal.3d 379, 391; see also *People* v. *Roy, supra,* 18 Cal.App.3d 537, 549.) It appears, however, that the defendant in *Mosher* relied primarily on a claim of unconsciousness although there was also evidence that he may have been intoxicated without having been unconscious. The *Roy* court also relied on our post-*Mosher* decision in *People* v. *Tidwell* (1970) 3 Cal.3d 82 [89 Cal.Rptr. 58, 473 P.2d 762]. In that case we also directed that if upon a retrial "there is evidence which indicates that defendant was unconscious at the time of the offenses due to voluntary intoxication, the trial court should instruct on involuntary manslaughter." (*Id.,* at pp. 86-87.) In that case, however, the defendant had testified that he was an inexperienced drinker, had consumed quantities of wine, beer and gin, had become drunk and had fallen asleep, and that he retained only a vague recollection of particular events, none of which incriminated him. We deem it significant that in the foregoing cases wherein we have directed on retrial that the court instruct on involuntary manslaughter conditioned on unconsciousness, the facts suggested in each instance that this was the mental state which the defendant sought to urge as a ground for his inability to entertain a particular mental state.

[6]*Mosher* further defines "involuntary manslaughter as the offense for which the jury should find defendant guilty if it determined that the defendant's mental capacity was diminished due to mental defect, mental illness, or intoxication such that the intent to kill as well as malice was rebutted." (*People* v. *Mosher, supra,* 1 Cal.3d 379, 390.)

[7]In *People* v. *Hayes* (1969) 276 Cal.App.2d 528 [80 Cal.Rptr. 893] it was held that an instruction on involuntary manslaughter in the context of diminished capacity resulting from voluntary intoxication was required "only where the defendant introduces evidence 'deserving of consideration,' that at the time of the commission of the crime, he was *unconscious* due to intoxication from drugs or alcohol voluntarily consumed." (*Id.,* at pp. 531-532, original italics.) *Hayes* purports to rely on *People* v. *Conley, supra,* 64 Cal.2d 310, 323 and *People* v. *Graham* (1969) 71 Cal.2d 303, 315-316 [78 Cal.Rptr. 217, 455 P.2d

Notwithstanding the significant body of law which appears to lend some support to the view expressed in *Roy,* it was not our intention to imply in *Mosher* or *Tidwell,* or in any earlier decision dealing with the issue, that an instruction on involuntary manslaughter in the context of diminished capacity based on intoxication is to be applicable *only* on evidence of the accused's unconsciousness due to his voluntary intoxication.[8] It is manifest, of course, that such evidence requires an instruction on involuntary manslaughter. (See CALJIC No. 8.47, fn. 4, *supra.*) But if an accused is unable to harbor malice and an intent to kill because of voluntary intoxication which does not render him unconscious he cannot be guilty of an unlawful homicide greater than involuntary manslaughter and the jury must be so instructed.[9] We cannot

153], in both of which cases judgments were reversed for failure to give instructions in recognition of diminished capacity, and in each case the only supplementary instruction on involuntary manslaughter suggested for retrial was conditioned upon a finding of unconsciousness. In each case, however, the accused had claimed that he was unconscious. (Cf. *People* v. *Roy, supra,* 18 Cal.App.3d 537, 547.)

[8]*Roy* has been applied in at least two subsequent decisions: *People* v. *Cisneros* (1973) 34 Cal.App.3d 399, 423 [110 Cal.Rptr. 269]; *People* v. *Long* (1974) 38 Cal.App.3d 680, 685, fn. 1 [113 Cal.Rptr. 530].

It also appears that following *Mosher* and prior to *Roy* CALJIC No. 8.48 provided in pertinent part: "There is no malice aforethought and intent to kill if by reason of diminished capacity caused by . . . intoxication, the defendant did not have the mental capacity to harbor malice aforethought and to form an intent to kill." Following *Roy* the instruction was revised to its present form (see fn. 4, *supra*) which negates an intent to kill based on involuntary intoxication *only* on a finding of unconsciousness resulting from such intoxication. The comment to the revised section states, citing *Roy:* "Although diminished capacity resulting from voluntary intoxication short of unconsciousness may rebut the existence of malice and reduce murder to voluntary manslaughter, in order for diminished capacity resulting from voluntary intoxication to rebut the existence of an intent to kill and reduce murder to involuntary manslaughter, the intoxication must have reached the point of unconsciousness."

[9]Although an accused may have been unconscious he is not entitled to the complete defense of unconsciousness recognized in section 26, subdivision Five, if such unconsciousness is the result of his voluntary intoxication. "The law does not permit [a defendant] to use his own vice as a shelter against the normal legal consequences of his act." (*People* v. *Conley, supra,* 64 Cal.2d 310, 326, fn. 4.) The policy of the law is expressed in such circumstances by section 22: "No act committed by a person while in a state of voluntary intoxication is less criminal by reason of his having been in such condition. But whenever the actual existence of any particular purpose, motive, or intent is a necessary element to constitute any particular species or degree of crime, the jury may take into consideration the fact that the accused was intoxicated at the time, in determining the purpose, motive or intent with which he committed the act." In the instant case, accordingly, defendant was entitled to proper instructions as to what bearing his voluntary intoxication, if any, had on the particular mental elements of the charged and lesser included offenses. We distinguish the mental elements which may be relevant to an unlawful killing (the same being an intent to kill and with malice aforethought) from the mental elements of a general intent crime. Such a crime cannot, for sound policy reasons, be successfully defended on the ground of voluntary intoxication. (See *People* v. *Rocha* (1971) 3 Cal.3d 893, 897-900 [92 Cal.Rptr. 172, 479 P.2d 372]; *People* v. *Hood* (1969) 1 Cal.3d 444 [82 Cal.Rptr. 618, 462 P.2d 370].)

subscribe to a rationale which holds that an accused, no matter what his degree of intoxication short of unconsciousness, must be deemed to harbor an intent to kill but may be deemed not to harbor malice aforethought. The doctrine of diminished capacity should not be further burdened by such fine distinctions.

 The involuntary manslaughter instruction requested by defendant in the instant case (see fn. 4, *supra*) would have been applicable only in the event of unconsciousness due to voluntary intoxication. He thus failed to make a request for proper instructions which he now claims the trial court erred in refusing to give. Although the court quite properly refused to give the requested instructions because there was no evidence of unconsciousness worthy of belief, the court was nevertheless required, *sua sponte,* to give proper instructions on involuntary manslaughter in the context of diminished capacity due to defendant's voluntary intoxication. A trial court must give a *sua sponte* instruction on an included offense "when the evidence raises a question as to whether all of the elements of the charged offense were present." (*People* v. *Sedeno, supra,* 10 Cal.3d 703, 715.) The weight of the evidence of defendant's intoxication was sufficient for a jury to have believed that although he was conscious he lacked both malice and an intent to kill. (See *id.,* at p. 720.) The court was required, accordingly, to have instructed that if, because of a diminished capacity due to defendant's voluntary intoxication, he had harbored neither malice nor an intent to kill the offense could be no greater than involuntary manslaughter.[10]

 We are unable to say that the failure to instruct on involuntary manslaughter in the context of diminished capacity was harmless error. The jury was given the choice of first degree murder, second degree murder and voluntary manslaughter and chose the least severe. We cannot say that had it been fully instructed the jury would have convicted defendant of any offense greater than involuntary man-

---

[10]"The obligation to instruct on a lesser included offense exists even when as a matter of trial tactics a defendant not only fails to request the instruction but expressly objects to its being given." (*People* v. *Sedeno, supra,* 10 Cal.3d 703, 716.) Although the failure to give the instruction because of the defendant's objection would constitute invited error and not grounds for reversal (*id.,* fn. 6), defendant here cannot be deemed to have objected to giving the instruction. In fact, the refused portion of the requested general instruction on diminished capacity (CALJIC No. 8.77, see fn. 4, *supra*) properly stated the rule and, if given, would have precluded a conviction for murder or voluntary manslaughter had the jury found that defendant's intoxication prevented him from harboring malice aforethought and an intent to kill. It may be deemed, accordingly, that defendant made an ambiguous request for a proper instruction.

slaughter. In any event an erroneous failure to instruct on a lesser included offense constitutes a denial of the right to have the jury determine each material issue presented by the evidence, and such error cannot be cured by weighing the evidence in an effort to determine that it would not be reasonably probable that a correctly instructed jury would have convicted defendant of the lesser included offense. (*People* v. *Sedeno, supra,* 10 Cal.3d 703, 720.) The judgment, accordingly, must be reversed.

For the reasons we have set forth we disapprove *People* v. *Hayes, supra,* 276 Cal.App.2d 528 and *People* v. *Roy, supra,* 18 Cal.App.3d 537 and their progeny to the extent that they hold that diminished capacity based on voluntary intoxication may operate to reduce an unlawful homicide to involuntary manslaughter *only* if. the intoxication renders the perpetrator unconscious. We further disapprove any and all implications in support of such a rule which may be read into our decisions.

The judgment is reversed.

Tobriner, J., Mosk, J., Sullivan, J., Clark, J., and Richardson, J., concurred.

McCOMB, J.—I dissent. In view of defendant's testimony that he killed in self-defense, the refusal to instruct on involuntary manslaughter was not prejudicial. (Cal. Const., art. VI, § 13; see also dissenting opinion in *People* v. *Sedeno,* 10 Cal.3d 703, 724 [112 Cal.Rptr. 1, 518 P.2d 913].)