Filed 2/18/26  P. v. Lay CA4/2

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

THE PEOPLE,

    Plaintiff and Respondent,

v.

BILLY RAYBUTCH LAY,

    Defendant and Appellant.

E083438

(Super.Ct.No. FMB23000117)

OPINION

APPEAL from the Superior Court of San Bernardino County.  Sarah Oliver, Judge. Reversed.

Heather Monasky, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Charles C. Ragland, Assistant Attorney General, A. Natasha Cortina and Elizabeth M. Renner, Deputy Attorneys General, for Plaintiff and Respondent.

1

## I.

## INTRODUCTION

A jury convicted defendant and appellant Billy Raybutch Lay of misdemeanor battery on a person in a dating relationship (Pen. Code,[1] § 243, subd. (e)(1)) as a lesser included offense of willfully inflicting corporal injury upon his former girlfriend, resulting in a traumatic condition (§ 273.5, subd. (a)).  On appeal, defendant claims the trial court prejudicially erred and violated his due process rights by failing to provide a self-defense instruction as to the lesser included battery offense.  We agree and reverse defendant's misdemeanor simple battery conviction.

## II.

## FACTUAL AND PROCEDURAL BACKGROUND

### A.  People's Evidence

Around 3:00 a.m. on March 11, 2023, San Bernardino County Sheriff's Department Detective Javier Lopez responded to a call from a duplex in Yucca Valley to investigate a break-in.  However, upon arrival and investigation, it was apparent to Detective Lopez that he was investigating a domestic violence incident.  Detective Lopez found defendant and the victim, Jane Doe, in the southwest bedroom of the duplex, and noticed that there was damage to the inside of the residence.  The bathroom door appeared to be torn in half and there was blood on the lower portion of the door.

---

[1]  All future statutory references are to the Penal Code.

Belongings were scattered in the bathroom and in front of the door of the bathroom like a struggle had taken place inside.

Detective Lopez explained that Jane was sitting against the wall between the doorway to the bedroom and the bathroom. Jane appeared fearful and frantic and was crying almost the entire time that she spoke with the detective. Jane requested medical attention immediately and kept requesting medical attention even after the detective called. Detective Lopez believed Jane was "very scared." Detective Lopez noticed that Jane's nose looked to be deformed and there was blood all over her face. In addition, Jane had redness on her neck and under her left eye, which was starting to swell, and there was blood pouring down her face. Detective Lopez believed the marks on Jane's neck could potentially be finger marks from squeezing. Jane's eyes were also bloodshot, which the detective opined could have resulted from blunt force trauma. Jane was eventually transported to a hospital.

Detective Lopez also observed that defendant had an abrasion to his knuckle, in the middle of the knuckle, and swelling on his right hand. Defendant also had minor abrasions to the back of his right elbow and his right bicep. Defendant's face was red.

Jane testified that defendant was her ex-boyfriend whom she had been dating for two years at the time of the incident. At around 2:00 a.m. on March 11, 2023, defendant sent Jane a text that said, "'Hi.'" Defendant did not respond to Jane's return texts, so she drove to his residence to ask why he was not responding, and to ask if he was cheating on

her.  Jane did not live at the Yucca Valley residence, but rather resided in Cabazon, a roughly 40-minute drive away.

Defendant was intoxicated when Jane arrived at defendant's residence.  Defendant let Jane in the house through the back door, where he was giving her "attitude."  Jane grabbed defendant's phone from off the bed to see if he was talking to anybody.  Defendant got up and chased Jane into the hallway bathroom, where he pushed the door in and got his phone back.  Defendant then laid down in the bed, and Jane grabbed his phone again because she knew there was something he did not want her to see.  Jane ran and hid in the bathroom in defendant's room.

Jane then closed the bathroom door and sat with her back against it, trying to hold it closed.  Defendant "pushed open the door excessively" by kicking it and punching it, and dragged Jane out.  Defendant threw Jane on top of the broken portion of the door and held her down with his forearm.  At that point, defendant strangled and headbutted Jane.  Jane recalled defendant placing both hands around her neck and bumping his head into hers.  Jane felt a "pop and a crack" and could not see.  Jane was treated for injuries as a result of the incident because she "dislocated something in [her] eye," had a broken nose, and scratches.  Several days after the incident, Jane still had bruising over her nose, a black eye, and some marks.

Jane stated that she did not put her hands on defendant during this incident other than to push him off when he was laying on top of her.  Jane called 9-1-1 and asked for

help, telling the operator that defendant busted down the bathroom door and headbutted her, and that her skull was cracked. Defendant also called 9-1-1.

An emergency room physician testified that Jane had a fractured left orbital, a fractured nose, and a scratch on her left eyeball. The doctor's notes reflected that Jane was headbutted while lying on the ground by somebody else, and Jane was having trouble seeing from her left eye, as well as pain and bleeding from the nose. The doctor noted Jane's injuries could be from the headbutting.

The day after the incident, defendant sent a text message to Jane stating: " 'I don't know if you got a restraining order or not, and I know you don't want to hear from me ever again, I just wanted to say sorry about what happened. I will most likely end up in prison.' " They continued to text each other for the next three days. Defendant told Jane that he would lose everything and his ex was now trying to keep his daughter from him. Jane texted defendant that she intended to go to court and say defendant fell on her and accidentally headbutted her. Defendant responded that her story would be discredited and she did not have to recant.

Jane testified that she changed her statement because she lived in the same town as defendant's family and feared revenge against herself and her children. Jane wrote a letter stating that she had a tug of war with defendant over the phone, which caused them both to fall, and that was how her nose got hurt. Jane also told an investigator that defendant broke down the door to get his phone back, and in the dark, the two of them tripped over the broken door. Jane also gave statements that had she not shown up to the

5

house or taken defendant's phone, nothing would have happened. She further stated that defendant was not a bad dad and she did not want to take his daughter from him. Jane claimed defendant told others that Jane was breaking into his house, which she denied. Jane's brake line was cut shortly after the incident, but she did not know who did it.

Jane recalled an incident a month prior to the attack where she and defendant argued because he had been drinking and she accused him of cheating. Defendant "swung on" her, threw her to the ground, punched her in the face, kicked her on the face while she was on the floor, and pushed the car door into her while she was trying to leave. Jane stated she suffered a swollen lip, scratch marks on her chin and neck, and a skull fracture. Jane slept "a whole day" after the attack because she was in pain and had a bad headache. Medical staff had to drain blood from Jane's "cauliflower ear." She told the healthcare providers that she fell down the stairs because she did not want it to affect defendant's life. Defendant sent an apologetic text the day after the February attack, stating, "'I couldn't control myself after what you said, but that is no excuse.'" Defendant also sent a text to Jane apologizing for hurting Jane and telling her that he felt horrible. Defendant noted that his face hurt, which Jane said was "probably me swinging on him to get him off me." Defendant kept apologizing, and Jane felt sympathy for him.

Jane described the relationship with defendant as toxic and admitted that they argued back and forth and that sometimes the arguments became physical with defendant always throwing the first blow. Jane denied being the initial aggressor in both the February and March incidents. At one point during their relationship, Jane sent a text to

6

defendant stating, "'You'll regret this,'" meaning defendant would regret losing her and not being with her. Jane admitted being convicted of assault by means to cause great bodily injury in violation of section 245, subdivision (a)(4), in 2015.[2]

B. *Defense Evidence*

Defendant's coworker from Home Depot, J.G., testified that he was with defendant on the evening of the incident and left somewhere between 2:00 and 3:00 a.m. J.G. tucked defendant in because defendant got "a little sick."

Defendant testified that he and Jane dated for about a year and half, and that the relationship was volatile. The two lived with each other for about a year and then stopped because Jane was "physically, emotionally, and mentally abusive" and would constantly accuse defendant of cheating on her. Defendant moved out to his house in Yucca Valley while Jane remained in Cabazon.

Defendant recalled there was an incident in August 2022 where he was sitting outside the house in his car and Jane pulled up with her truck, essentially blocking him from leaving. Defendant claimed Jane struck him several times on the side of his face while he was sitting in the car. Defendant moved out about a month later. Regarding the February incident, defendant said he had gone bowling with friends and drove home. When he arrived home at around 11:00 p.m. or midnight, Jane pulled up and blocked him

_____

[2] Evidence was admitted into trial of the photo of the bathroom door, Exhibit 1; photos of the bathroom, Exhibits 2 to 4; photo of Jane's face, Exhibit 12; photo showing redness to Jane's neck, Exhibit 13; photos of defendant's injuries, Exhibits 7 to 11; photo of defendant's face, Exhibit 12; photo of Jane's injuries after a few days, Exhibit 16; the 9-1-1 calls, Exhibits 25 and 25A; the text messages between defendant and Jane, Exhibit 24; and photos of Jane's injuries from the February incident, Exhibits 18 to 22.

from leaving again. Jane then ran up and punched him on the left side of his face six times, so defendant hit her three times in the face. Defendant described the assault as "a straight left jab to her mouth area, a right hook to somewhere around the left side of her face, and then a left upper cut." Defendant called police after that incident and showed responding officers his lip, which he said was "busted."

As to the March 2023 incident, defendant stated that he had too much to drink and went to sleep. When he woke up, there was someone he did not know who unlocked his phone with his fingerprint. Defendant woke up, grabbed the person, and was struck on the left side of his face. Defendant let the person go and noticed it was Jane when she retreated into the bathroom. Jane would not let defendant into the bathroom, so defendant punched a hole through the bathroom door and tried to unlock it from the inside. Jane hit defendant's hand, so he kicked the bottom half of the door off of its hinges. Defendant entered the bathroom and Jane used her hand on his throat to keep him back. Jane tripped over the bottom half of the broken door and they both fell. Defendant claimed that as they were struggling, and he tried to reach for his phone, Jane grabbed him by the neck with her left hand, and he grabbed her by the neck with his right hand, leading them to fall into the bedroom. Defendant landed on top of Jane and that when he tried to pry himself up and Jane dug her nails into his right bicep. Defendant headbutted Jane in the nose and she let him go, at which point he walked outside of his house to call the police and waited until they arrived.

Defendant informed Detective Lopez that his girlfriend broke into his house, that they fought, and that defendant headbutted her. Defendant expressed remorse for headbutting Jane and said he felt "ashamed" for doing so. Defendant claimed it was necessary to get his phone so that he could call police, because he did not want to bother his neighbors early in the morning. Defendant stated that Jane had previously tried to break into his house between midnight and 4:00 a.m., and that at times she would bang on his door and windows, and try to pry open defendant's screens. Defendant admitted that once Jane was in the bathroom, he was not in any physical danger.

Defendant recalled a prior incident in which Jane put a knife to her own throat and threatened to harm herself if defendant did not tell her who he was dating.

C. *Rebuttal Evidence*

Jane admitted to the incident with the knife, stating that she had just had a miscarriage and that defendant treated her like she meant nothing, so she told him she was tired of living. Jane reiterated that she did not break into defendant's home on the evening in March 2023, and denied grabbing defendant by the throat or scratching his arms.

D. *Procedural Background*

On August 18, 2023, defendant was charged with one count of willfully inflicting corporal injury resulting in a traumatic condition upon his former girlfriend, Jane Doe (§ 273.5, subd. (a)).

9

Following the close of evidence, the parties discussed jury instructions. In pertinent part, the trial court granted defense counsel's request for an instruction on the right to self-defense pursuant to CALCRIM No. 3470. The court instructed the jury as follows, in relevant part: "*Self-defense is a defense to Inflicting Corporal injury on a Spouse, Cohabitant, or Fellow Parent.* The defendant is not guilty of those crimes if he used force against the other person in lawful self-defense or defense of another. The defendant acted in lawful self-defense or defense of another if: [¶] 1. The defendant reasonably believed that he or someone else was in imminent danger of suffering bodily injury or was in imminent danger of being touched unlawfully; [¶] 2. The defendant reasonably believed that the immediate use of force was necessary to defend against that danger; [¶] 3. The defendant used no more force than was reasonably necessary to defend against that danger."[3]

The court additionally agreed to instruct the jury pursuant to CALCRIM Nos. 3475 [Right to Eject Trespasser From Real Property], 3476 [Right to Defend Real or Personal Property], and 3477 [Presumption that Resident was Reasonably Afraid of Death or Great Bodily Injury].

Regarding the substantive offenses, the trial court instructed the jury with CALCRIM No. 840, which stated in relevant part: "The defendant is charged in Count 1 with inflicting injury on someone with whom he had or previously had an engagement or dating relationship in violation of Penal Code section 273.5(a). [¶] To prove that the

---

[3] Pursuant to stipulation by the parties, the trial court's oral instructions were not reported by the court reporter but are found in the clerk's transcript.

10

defendant is guilty of this crime, the People must prove that:  [¶]  1. The defendant willfully inflicted a physical injury on someone with whom he had, or previously had, an engagement or dating relationship;  [¶]  AND  [¶]  2. The injury inflicted by the defendant resulted in a traumatic condition  [¶]  AND  [¶]  3. The defendant did not act in self-defense."

Regarding the lesser included offense of simple battery, the jury was given CALCRIM No. 841, which stated in relevant part:  "Simple battery:  against spouse, cohabitant, fellow parent or person with whom he had a [*sic*] engagement or dating relationship is a lesser included offense to the crime charged in Count 1.  [¶]  To prove the defendant is guilty of this crime, the People must prove that:  [¶]  1. The defendant willfully and unlawfully touched Jane Doe in a harmful or offensive manner;  [¶]  AND  [¶]  2. Jane Doe is a person with whom defendant currently has or previously had a dating relationship."  The standard instruction for CALCRIM No. 841 contains an optional third element when instructing on self-defense or defense of another, which was not given in defendant's case.  That third element states:  "The defendant did not act (in self-defense/[or] defense of someone else."  (CALCRIM No. 841.)

CALCRIM No. 841 also explained:  "Someone commits an act willfully when he or she does it willingly or on purpose.  It is not required that he or she intend to break the law, hurt someone else, or gain any advantage.  [¶]  The slightest touching can be enough to commit battery if it is done in rude or angry way.  Making contact with another person,

11

including through her clothing, is enough. The touching does not have to cause pain or injury of any kind."

During closing argument, self-defense was addressed by both parties. In her closing, the prosecutor argued that defendant did not act in self-defense in committing the greater offense because when he went after Jane, he was not in danger. The prosecutor explained, "[i]t is not reasonable to conclude that a person proceeds to tear the rest of the door in half and drag the person inside out in self-defense" and that the fingerprints on Jane's neck were not a reasonable response to having a phone taken away.

Defense counsel referred the jury to CALCRIM No. 3470 and commented that "our self-defense laws are very robust." Defense counsel argued that defendant had the right to eject a trespasser, and that he had a right to protect himself in his own home. Defense counsel also argued defendant had the right to defend real and personal property. Defense counsel concluded: "Here's the ultimate conclusion in this case, ladies and gentleman, is that you should vote not guilty, and Jury Instructions 3470, 3475, 3476, and 3477, all of those are valid good reasons to acquit [defendant]. Finally, I believe on the verdict forms that there is also the lesser included. There is the lesser included for 243(e)(1), and on that, you should also vote not guilty for [defendant]."

In rebuttal, the prosecutor argued that the force used against Jane was not reasonable, because ejecting a trespasser requires that a person use reasonable force necessary to make the trespasser leave, and that the evidence did not show that defendant feared for his life.

12

Immediately thereafter, the trial court stated, "Ladies and gentlemen of the jury, you heard some comments about the law and the evidence. I'm asking you to remember that the argument by counsel is not evidence, and they are not to instruct you on the law. That, of course, comes from me . . . ." The court then proceeded to read the jury instructions, which included the following language from CALCRIM No. 200 ["Duties of Judge and Jury"]: "You must follow the law as I explain it to you, even if you disagree with it. If you believe that the attorneys' comments on the law conflict with my instructions, you must follow my instructions."

After commencement of deliberations, the jury submitted a note stating, "We need clarification on the word "unlawful" in the Simple Battery charge? What will make the head butt unlawful if there was a mutual, physical fight?"

At a hearing addressing the note, the following colloquy occurred between the trial court and the parties:

"THE COURT: The Court has received a question from the jurors. Specifically, we need clarification on the word unlawful in the simple battery charge. What would make it unlawful if there was a mutual physical fight?

"[DEFENSE COUNSEL]: They should be referred to the instructions regarding self-defense.

"THE COURT: And I tend to agree with defense counsel. [¶] Any comments?

"[DEFENSE COUNSEL]: No, your Honor.

"THE COURT: Okay.

13

"[PROSECUTOR]: I would just note that unlawful is more or less self-explanatory. It's the context, an act that is not welcome or permitted. [¶] Self-defense is its own instruction. Note that self-defense is a separate instruction, an element of simple battery, as well. Unlawful would simply mean a touch not permitted and I would ask that that be the answer.

"THE COURT: But, I agree that an unlawful touching defined by the question in context of a mutual fight which then leads to the self defense, so if the touching occurred there in context of a mutual fight, the question becomes whether it was actually an act of self-defense, that specific touching. So, I think, I believe that it's necessary to direct them back to the self-defense instruction and make a determination as to whether that specific act falls within the self-defense definition. [¶] . . . [¶]

"[PROSECUTOR]: They seem to be specifically referring to mutual combat which is not an instruction that was requested by the defense or permitted by this Court.

"THE COURT: And [defense counsel]?

"[DEFENSE COUNSEL]: That's what I was going to suggest is, I guess we're kind of late in the game to try to instruct on mutual combat. However, reinstructing is my suggestion.

"THE COURT: The Court is going to instruct the jurors to make a determination as to whether that fact falls within the definition of self-defense or per that instruction. If not, it's an unlawful act."

14

The trial court then advised both counsel, without objection, that it was "going to provide that and then I'm going to release them at 4."

Six minutes after the court's instruction the jury returned a verdict. The jury acquitted defendant of the greater offense but convicted him of the lesser included offense of misdemeanor battery against Jane Doe, a person with whom he had a former dating relationship, in violation of section 243, subdivision (e)(1).

On February 23, 2024, the trial court sentenced defendant to a three-year term of probation on various terms and conditions and ordered him to take a 52-week Domestic Violence Batterers Program. Defendant timely appealed.

III.

DISCUSSION

Defendant argues the trial court prejudicially erred in instructing the jury that self-defense could only apply to the greater charged offense, lessened the government's burden of proof, and denied him a fair trial. He also contends that the court should have instructed that self-defense could apply to the lesser charged offense because there was substantial evidence to support the self-defense instruction for the lesser charge and the jury's term of a "mutual, physical fight" can include a situation where a defendant has the right to act in self-defense. Defendant further asserts his counsel did not invite the error and the claim is cognizable on appeal.

" '[T]he trial court must instruct on the general principles of law relevant to the issues raised by the evidence.' " (*People v. Smith* (2013) 57 Cal.4th 232, 239.) We

independently review claims of instructional error.  (*People v. Mitchell* (2019) 7 Cal.5th 561, 579 (*Mitchell*); *People v. Posey* (2004) 32 Cal.4th 193, 218.)  We examine the challenged instruction "in the context of the instructions as a whole and the trial record to determine whether there is a reasonable likelihood the jury applied the instruction in an impermissible manner."  (*People v. Houston* (2012) 54 Cal.4th 1186, 1229.)

Moreover, under " 'appropriate circumstances' a trial court may be required to give a requested jury instruction that pinpoints a defense theory of the case . . . ."  (*People v. Bolden* (2002) 29 Cal.4th 515, 558.)  "But a trial court need not give a pinpoint instruction if it is argumentative [citation], merely duplicates other instructions [citation], or is not supported by substantial evidence."  (*Ibid.*)  However, a defendant bears the burden of requesting a pinpoint instruction; a trial court has no sua sponte duty to provide one.  (*People v. Gutierrez* (2009) 45 Cal.4th 789, 824.)

Furthermore, "[a] trial court must instruct the jury sua sponte on general principles of law applicable to the case," including any defense supported by substantial evidence that "is not inconsistent with the defendant's theory of the case."  (*People v. Villanueva* (2008) 169 Cal.App.4th 41, 49 (*Villanueva*); *People v. Barton* (1995) 12 Cal.4th 186, 195.)  In "deciding whether the evidence is sufficient to warrant a jury instruction, the trial court does not determine the credibility of the evidence, but only whether there is evidence which, if believed by the jury, is sufficient to raise a reasonable doubt of guilt."  (*People v. Orlosky* (2015) 233 Cal.App.4th 257, 269-270.)

" 'Generally, a party may not complain on appeal that an instruction correct in law and responsive to the evidence was too general or incomplete unless the party has requested appropriate clarifying or amplifying language.' [Citation.] But that rule does not apply when . . . the trial court gives an instruction that is an incorrect statement of the law." (*People v. Hudson* (2006) 38 Cal.4th 1002, 1011-1012.) Moreover, a failure to object to instructional error will not result in forfeiture if the error affects the defendant's substantial rights. (§ 1259; *Mitchell*, *supra*, 7 Cal.5th at p. 579.)

The People contend that defendant forfeited his claim of instructional error and invited the error because he did not object to the instructions on self-defense and specifically agreed to the court's instruction on self-defense as to battery during deliberations. We reject this argument.

Initially, we agree that if defendant wanted the trial court to instruct the jury to consider his self-defense in connection with the lesser included offense of simple battery, "it was incumbent upon him to ask, and a claim of error in the failure to so instruct is forfeited for appellate purposes." (*People v. Townsel* (2016) 63 Cal.4th 25, 59 (*Townsel*).) Defendant's argument, however, is not merely that the trial court failed to give the instruction in connection with the battery charge. Rather, he contends that the trial court erred in omitting element three of lack of self-defense on the battery instruction in CALCRIM No. 840, and that in directing the jury to consider self-defense solely on the question of whether he acted in self-defense on the greater offense of inflicting corporal injury, the instruction affirmatively and erroneously precluded the jury from

17

considering the self-defense evidence in connection with the battery charge. As previously noted, "[w]e may review defendant's claim of instructional error, even absent objection, to the extent his substantial rights were affected." (*Townsel*, *supra*, at pp. 59-60; accord § 1259 ["The appellate court may . . . review any instruction given, refused or modified, even though no objection was made thereto in the lower court, if the substantial rights of the defendant were affected thereby"].)

In *Townsel*, *supra*, 63 Cal.4th 25, our Supreme Court held a defendant did not forfeit a claim of instructional error on appeal under similar circumstances to the ones presented in this matter. The trial court in *Townsel* had instructed the jury that it could consider the defendant's intellectual disability solely in connection with whether defendant formed an intent to kill, thereby erroneously precluding the jury from considering defendant's intellectual disability on a dissuading a witness charge and a witness killing special-circumstance allegation. (*Townsel*, *supra*, 63 Cal.4th at p. 57.) The defendant never objected to the instruction, but argued he could challenge the instruction on appeal because the instructional error affected his substantial rights, and specifically his constitutional rights "to a fair trial, proof beyond a reasonable doubt and trial by jury on every element of the charged offenses, a meaningful opportunity to present a defense, and a reliable jury verdict." (*Id.* at p. 60.) The Supreme Court agreed the error affected defendant's substantial rights and was reviewable on appeal despite the lack of objection below. (*Ibid.*)

The type of instructional error committed here is indistinguishable from the error in *Townsel*; in both cases, the jury was erroneously precluded from considering relevant evidence on certain charges. Therefore, following *Townsel*, we hold the trial court's incomplete instructions in this case affected defendant's substantial rights, and that defendant's assertion of instructional error is not forfeited on appeal.

We also reject the People's claim that defense counsel invited the error. There is no indication in the record that trial counsel intentionally sought incorrect or incomplete jury instructions for a tactical purpose. (See *People v. Marshall* (1990) 50 Cal.3d 907, 931 ["Defense counsel must be deemed to have intentionally caused the claimed "error"]; *People v. Graham* (1969) 71 Cal.2d 303, 317-320 [Supreme Court rejected the People's contention the defendant had invited the error because trial counsel acceded to the incorrect instruction based on neglect or mistake and not due to a deliberate tactical decision; court reasoned trial counsel had acted inadvertently and concluded such mistake cannot overcome the trial court's duty to correctly instruct on the law], overruled on other grounds in *People v. Ray* (1975) 14 Cal.3d 20, 29, fn. 7, 32.) Here, the record indicates defense counsel conducted a vigorous defense of defendant and argued defendant acted in self-defense. In addition, trial counsel requested several instructions in addition to self-defense so the jury might find that defendant's actions were defensible, such as CALCRIM No. 3475 (right to eject a trespasser), CALCRIM No. 3476 (right to defend real and personal property), and CALCRIM No. 3477 (presumption resident had fear of great bodily injury or death). Furthermore, defendant testified to acting in self-defense.

19

We further reject the People's contention that there was no substantial evidence to support a self-defense instruction on the lesser included battery charge. The trial court correctly recognized that defendant's testimony supported a self-defense instruction. Moreover, the court specifically referred the jurors to the self-defense instruction when they needed clarification on the word "unlawful" in the simple battery charge and inquired "what will make the head butt unlawful if there was a mutual, physical fight." Defendant testified that Jane had her arm on defendant's neck, holding him at bay and that Jane had pinned defendant on the ground with her arm. Defendant also stated that he only had his hand on Jane's neck to keep her at bay until they fell, at which time, she held him down. At that point, defendant used force, i.e., the headbutt, to free himself and get his phone. Defendant's account of the incident constitutes substantial evidence from which the jury could reasonably infer that defendant reasonably believed that he was in imminent danger of suffering bodily injury, that the immediate use of force was necessary to defend himself against the danger, and that he used a reasonable amount of force to defend against that danger. Given that substantial evidence supported defendant's claim of self-defense and that he actually relied on that theory, the trial court had a duty to correctly instruct the jury on self-defense as to the battery charge. (*Villanueva*, *supra*, 169 Cal.App.4th at p. 49.) The court therefore erred by failing to instruct the jury on self-defense as it related to simple battery and only instructing the jury on self-defense as it related to the greater offense.

The People's arguments to the contrary are unavailing. The People contend that the evidence was insufficient to support a self-defense finding because defendant "did not have a reasonable or honest belief that bodily injury or unlawful touching was about to be inflicted upon him after [Jane] retreated to the bathroom." The People mistakenly believe that Jane had retreated to the bathroom. However, the evidence shows Jane went into the bathroom with defendant's phone to look through it because she believed he was hiding something. Defendant then went to retrieve his phone and the two struggled over the phone with Jane pinning defendant down and holding him until he broke free.

Having concluded that the trial court erred by not instructing the jury with CALCRIM No. 3470 as to simple battery and omitting element three in CALCRIM No. 840, we next analyze whether the instructional error was prejudicial. The California Supreme Court has "yet to determine whether a trial court's failure to instruct on a requested affirmative defense instruction supported by substantial evidence is federal constitutional error or state law error." (*People v. Gonzalez* (2018) 5 Cal.5th 186, 199; *People v. Salas* (2006) 37 Cal.4th 967, 984; see *Chapman v. California* (1967) 386 U.S. 18, 24 [federal harmlessness standard]; *People v. Watson* (1956) 46 Cal.2d 818, 836-837 [state law harmlessness standard].) We need not resolve the question in this case, because the error was prejudicial even under the state law standard. Under that standard, reversal is warranted if it is " 'reasonably probable that a result more favorable to the appealing party would have been reached in the absence of the error.' " (*Watson*, at pp. 836-837.) In this context, a probability " ' "does not mean more likely than not, but

21

merely a *reasonable chance*, more than an *abstract possibility*." ' " (*Richardson v. Superior Court* (2008) 43 Cal.4th 1040, 1050.)

The jury found defendant not guilty of the greater offense of felony domestic violence arising from the same events. That finding indicates that the jury did not entirely believe Jane's version of events. Given that defendant admitted that he used force against Jane in the February 2023 encounter, the jury could have disbelieved Jane's version of the account in its entirety as to the March 2023 incident, believed defendant's version, and still found defendant guilty of simple battery. Although the jury was instructed on the self-defense instruction for the greater felony domestic violence charge, the court did not instruct the jury of the self-defense instruction for misdemeanor simple battery and omitted the third element that it had to find that defendant did not act in self-defense in order to convict him of misdemeanor simple battery. The jury was not given any guidance on the law of self-defense as it related to the lesser offense of simple battery. The jury thus was left to its own devices to define the term according to the court's instruction that "[w]ords and phrases not specifically defined in these instructions are to be applied using their ordinary, everyday meanings." (CALCRIM No. 200.) But self-defense is an affirmative defense with specific legal requirements that the jury needed to find were not satisfied in order to convict defendant. In light of the jury's question as it related to simple battery, it is possible that the jury would have found that defendant's use of force satisfied the legal definition of self-defense, if the jury had been properly instructed on self-defense as it related to simple battery.

Given the jury's rejection of Jane's full version of the events, there is a reasonable probability that the same jury would have returned a verdict more favorable to defendant on the lesser included offense of misdemeanor domestic battery had it been instructed on self-defense. For all of these reasons, we conclude that it was prejudicial error not to instruct the jury on self-defense as it related to simple battery and omitting element three in CALCRIM No. 840. We accordingly reverse defendant's conviction under section 243, subdivision (e)(1).

## IV.

## DISPOSITION

Defendant's conviction under section 243, subdivision (e)(1), for misdemeanor simple battery is reversed.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

CODRINGTON
J.

We concur:


McKINSTER
Acting P. J.


MILLER
J.