Filed 5/23/16  P. v. Camunas CA4/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA


| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>MIGUEL CAMUNAS,<br><br>    Defendant and Appellant. | D068197<br><br><br>(Super. Ct. No. SCS264069) |


APPEAL from a judgment of the Superior Court of San Diego County, Edward P. Allard III, Judge.  Affirmed.

Robert Booher, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, A. Natasha Cortina and Christine Levingston Bergman, Deputy Attorneys General, for Plaintiff and Respondent.

A jury found Miguel Camunas committed misdemeanor assault, robbery, and burglary while at a Target store and store parking lot.  (Pen. Code, §§ 211, 240, 459.)[1] The jury found Camunas not guilty of assault with a deadly weapon and that he did not personally use a deadly or dangerous weapon in committing the robbery.  The court reduced the burglary charge to a misdemeanor and placed Camunas on three years' summary probation.

Camunas contends (1) the prosecutor committed prejudicial misconduct during her cross-examination and closing argument; (2) the court erred in failing to sua sponte give an unconsciousness instruction; and (3) the court erred in failing to recognize it had the discretion to dismiss the robbery count.  We determine the contentions are without merit and affirm.

FACTUAL SUMMARY

*Prosecution Case*

On the afternoon of April 14, 2013, 24-year-old Camunas entered a Target store, took stereo equipment without purchasing the product, and then placed this large item in the store parking lot.  Camunas then immediately reentered the store and took two video game systems, walked outside the store without purchasing the items, and placed the systems in two empty shopping carts in the parking lot.

Camunas then again reentered the store and went to a locked case containing iPads.  An employee asked if he needed assistance, and when Camunas did not respond,

---

[1]     All further statutory references are to the Penal Code.

2

the employee called loss prevention.  Camunas then went to the hardware department, picked up a screwdriver, returned to the iPad case, and tried to pry it open.  After a short time, Camunas was able to open the case and took four iPads, and again walked out of the store without paying for the items.

Under Target's policy, the store employees did not confront Camunas and instead called the police.  But two Target employees (Christian Santiago, a security employee, and Connor Nix, the general manager) followed Camunas outside the store and watched him from a distance.  They saw Camunas throw one of the iPads into the bed of a truck leaving the parking lot.[2]

Nix began speaking loudly into a walkie-talkie to identify the truck's description and license plate number.  Apparently hearing Nix, Camunas turned toward Nix and began chasing him, yelling, "What the hell are you doing?"  Nix testified he thought Camunas had a screwdriver in his hand while he was chasing him, but other evidence showed that Camunas threw the screwdriver into the bushes before he began running towards Nix.[3]  During the chase, Camunas dropped all but one of the remaining iPads, which he threw at Nix when he was about 15 feet away, but did not hit him.   Camunas

---

[2]    Later investigation determined the truck owners had no knowledge or involvement in the crimes; the owners returned the iPad shortly after discovering it in the back of their vehicle.

[3]    The jury verdict shows the jury credited the evidence that Camunas did not have the screwdriver while he was chasing Nix.

then followed Santiago's commands to stop, and Camunas began collecting the iPads from the ground.

Meanwhile, Nix (who was terrified) ran into an adjacent store, where he told an off-duty transit officer what had happened. The transit officer arrested Camunas, who then sat on the ground. Police officers arrived shortly after, and Camunas complied with the officers' directions. The officers testified that Camunas was silent, and did not engage in schizophrenic-type behaviors such as grabbing at the air, hitting his head on the ground, or talking to himself.

Camunas was charged with several crimes, including: (1) robbery with an enhancement allegation that he personally used a deadly and dangerous weapon (§§ 211, 12022, subd. (b)(1)); (2) assault with a deadly weapon (§§ 245, subd. (a)(1); and (3) burglary (§ 459).

*Defense*

Camunas's primary defense was that he did not have the requisite intent or state of mind to commit the charged crimes because he suffered from mental illness. In support, he presented the testimony of his mother (Mother) and adult sister, who testified to Camunas's gradual mental decline and eventual paranoid schizophrenia diagnosis. When Camunas was growing up and in his young adulthood, he was a successful, high-functioning individual who attended college, was employed, coached soccer, and had many friends. However, beginning in 2012, when he was about 23 years old, Camunas began isolating himself and acting strangely. Soon after, he lost his job and broke up

4

with his long-time girlfriend. When his family took Camunas to a doctor in December 2012, the doctor diagnosed him with depression and prescribed medication.

During the next several months, Camunas's behavior continued to get worse. He suffered from auditory hallucinations and had to be watched by his parents at all times. On the morning before he committed the crimes, Camunas told Mother he was hearing people talking about him, although "there was nobody there." Without his parents' knowledge, Camunas then took their car and drove to the Target store. Later that day, he was arrested for the robbery/burglary/assault offenses.

At trial (which took place about two years after Camunas's arrest), Camunas's counsel presented evidence of Camunas's postarrest mental health issues. About two or three months after his arrest, in July 2013, Camunas's physicians again diagnosed him with depression. About seven months later, in February 2014, Camunas was admitted to a mental hospital (referred to as "Aurora Hospital"), where he stayed for about two weeks. At the hospital, the doctors diagnosed Camunas with paranoid schizophrenia and gave him medication for this condition. During the hospitalization, he suffered from command hallucinations and florid psychotic symptoms, "basically the full schizophrenia presentation . . . ."

At the time of trial, Camunas was being treated by Dr. Neil Alex, who prepared a letter regarding Camunas's current diagnosis. The letter, a defense exhibit at trial, read:

> "[Camunas] is currently under my care and has current diagnoses of major depression, generalized anxiety disorder, and psychotic disorder. He was diagnosed with chronic paranoid schizophrenia while under the care of Michael Takamur at Aurora Hospital and this diagnosis was [also] given by [a] therapist . . . . He continues to

5

have feelings that the Bible talks with him specifically, but no longer has command hallucinations which resulted in his hospitalization."

Dr. Francesca Lehman, a clinical and forensic psychologist, testified at trial as a defense expert. Dr. Lehman opined that at the time of the alleged crimes, Camunas was in the "onset phase" of a schizophrenia disorder, "sometimes called schizophrenic break or psychotic break"[4] and he also engaged in marijuana abuse. She testified that during the onset schizophrenia phase, there is a "decline in functioning," which can "be the highest risk time" because "[t]hey do not know what is going on" and it may feel as if the individual "is losing [his] mind." She said that during this time, "the diagnosis is often missed or misdiagnosed and not treated properly. This is a time when they are declining and often not getting the help they need, and the people around them are very confused. . . . So this is a high risk time for a person who is sort of declining into mental illness." Dr. Lehman opined that when Camunas committed the offenses he had "impaired judgment," meaning he was not weighing the consequences of his actions in a logical manner. Dr. Lehman said it was "unquestionable" that Camunas was engaging in "goal-directed behavior" while he was at Target, but that his conduct—taking items from the store and leaving them unattended in the parking lot—did not make sense and "seemed strange and bizarre in nature."

Regarding the marijuana abuse, Dr. Lehman testified this "is common with people who are coming down with mental illness, particularly when they are untreated, they are

_____

4    Dr. Lehman identified the formal name of the disease as "other schizophrenia spectrum and other psychotic disorder-attenuated psychosis syndrome."

6

trying to, often trying to get ahold of their mental states. It is kind of self-medicating with marijuana . . . ." Dr. Lehman said that marijuana "can exacerbate the onset and prognosis" of schizophrenia.

After deliberations, the jury returned verdicts finding Camunas: (1) guilty of robbery, but that he did not personally use a deadly or dangerous weapon in committing this crime; (2) not guilty of assault with a deadly weapon, but guilty of the lesser included misdemeanor simple assault crime; and (3) guilty of burglary.

## DISCUSSION

### I. *Alleged Prosecutorial Misconduct*

Camunas contends the prosecutor twice engaged in misconduct: (1) cross-examining Camunas's mother about her testimony that marijuana caused Camunas's schizophrenia; and (2) suggesting during oral argument that Camunas's current doctor did not diagnose him with schizophrenia. We determine the prosecutor did not engage in misconduct, and even if the prosecutor's challenged questions and arguments were not fully supported by the record, the prosecutor's conduct did not preclude a fair trial or affect the outcome of the trial.

### A. *Generally Applicable Law*

A criminal prosecutor is held to elevated standards "because of the unique function he or she performs in representing the interests, and in exercising the sovereign power, of the state." (*People v. Hill* (1998) 17 Cal.4th 800, 819-820.) " 'A prosecutor's conduct violates the Fourteenth Amendment to the federal Constitution when it infects the trial with such unfairness as to make the conviction a denial of due process.'

7

[Citations.] Under California law, a prosecutor who uses deceptive or reprehensible methods of persuasion commits misconduct even if such actions do not render the trial fundamentally unfair." (*People v. Doolin* (2009) 45 Cal.4th 390, 444.)

" ' "A defendant's conviction will not be reversed for prosecutorial misconduct" that violates state law, however, "unless it is reasonably probable that a result more favorable to the defendant would have been reached without the misconduct." [Citation.]' [Citation.] Bad faith on the prosecutor's part is not a prerequisite to finding prosecutorial misconduct under state law. [Citation.] . . . . ' "[T]he term prosecutorial 'misconduct' is somewhat of a misnomer to the extent that it suggests a prosecutor must act with a culpable state of mind. A more apt description of the transgression is prosecutorial error." ' [Citation.]" (*People v. Lloyd* (2015) 236 Cal.App.4th 49, 60-61.)

Generally, a claim of prosecutorial misconduct or error is not preserved for appeal if a defendant fails to object and seek a jury admonition, unless an objection and admonition would not have cured the injury. (*People v. Seumanu* (2015) 61 Cal.4th 1293, 1339; *People v. Crew* (2003) 31 Cal.4th 822, 839.)

B. *Cross-Examination of Mother*

1. *Factual Summary*

During direct examination, Mother testified that Camunas's mental health problems began in 2012 and continued through the trial date in March 2015. When defense counsel asked Mother about Camunas's release from the mental hospital in March 2014 (about 11 months after the charged crimes), Mother testified that she and her husband and adult children had a family meeting with Camunas's psychiatrist, and during

8

the meeting, "[t]he psychiatrist told us that [Camunas] was a paranoid schizophrenia, and *she told us that she thought it would be because he told her that he had smoked marijuana*." (Italics added.) She said the psychiatrist gave Camunas several medications, but that the hallucinations continued. Mother testified that Camunas was doing better by the time of trial after his doctors adjusted the medications.

During cross-examination, the prosecutor elicited Mother's testimony that at the time of the arrest Camunas had not yet been diagnosed with schizophrenia. The prosecutor then referred to Mother's testimony about the connection between Camunas's marijuana use and his schizophrenia diagnosis in March 2014. This exchange was as follows:

> "[Prosecutor]: And it was at that time that his doctor informed you that he was diagnosed with paranoid schizophrenia *and that was partly or because he smoked marijuana*. Do you remember telling us that this morning?"
>
> "[Mother]: Yes."
>
> "[Prosecutor]: Were you aware that your son had been smoking marijuana?"
>
> "[Mother]: Before, he did not smoke marijuana."
>
> "[Prosecutor]: Before when?"
>
> "[Mother]: All of — before all of this." (Italics added.)

In responding to several additional questions, Mother again said she had been unaware of Camunas's marijuana use, but acknowledged that he might have used marijuana to help him sleep. After this testimony, the prosecutor repeated: "And you, again, you didn't see him smoking the marijuana that his doctor talked about *and had led*

9

*to schizophrenia, correct*?"  (Italics added.)  Camunas replied "No.  No."  The prosecutor then later repeated:  "Returning your attention back to *what the doctor told you about his paranoid schizophrenia being from marijuana use*, you don't know when he began using marijuana, correct?"  (Italics added.)  Mother then denied that Camunas smoked marijuana on the day of his arrest.

On redirect, defense counsel asked Mother whether in March 2014, the psychiatrist "told you [Camunas] got schizophrenia from smoking marijuana, or did she tell you that smoking marijuana could make the schizophrenia worse?  Mother replied that Camunas's treating psychiatrist "said that she saw . . . that [Camunas] had paranoid schizophrenia, and she thought that [the marijuana smoking] affected him even more."  Defense counsel then asked whether the doctor told her that "the marijuana caused the paranoid schizophrenia or did she say that the marijuana could make the paranoid schizophrenia worse?"  Mother responded:  "What she said was she told him to stop and take his medication to see how . . . it would go."

During recross, the prosecutor again asked several questions about Mother's knowledge of Camunas's prior marijuana use, and then asked:  "But the doctor who you met with [at the family meeting in March 2014] noted that [Camunas's] marijuana use *was part of why he had paranoid schizophrenia*?"  (Italics added.)  Mother responded:  "[The doctor] said that [Camunas] was paranoid schizophrenia and if he smoked marijuana, that could make it worse."  The prosecutor later again asked Mother whether at the March 2014 family meeting, the doctor "discussed with you and your family that

10

your son had paranoid schizophrenia and that was because he smoked marijuana, correct?" Mother responded, "That it could be."

The court then interrupted the prosecutor and (in the jury's presence) expressed concern that the prosecutor was asking questions about the basis for Camunas's diagnosis without having seen or evaluated the psychiatrist's report. The prosecutor acknowledged she had not reviewed the report, and in response, the court implied the prosecutor's line of questioning had been improper. The prosecutor then ended her cross-examination after asking two additional questions about Mother's knowledge of Camunas's marijuana use.

At the end of the trial, the court referred to this colloquy with the prosecutor, and told the jury the exchange should have occurred outside the jury's presence because it concerned a legal issue. The court assured the jury that the prosecutor was "a very good lawyer and she is a very ethical lawyer," and that defense counsel is also "a very good lawyer."

## 2. *Analysis*

Camunas contends the prosecutor engaged in prejudicial misconduct by asking Mother questions about whether Camunas's marijuana use caused his schizophrenia without any reasonable belief regarding the existence of such a link.

Camunas's contention is without merit. The permissible scope of cross-examination is broad. (*People v. Cooper* (1991) 53 Cal.3d 771, 822; see *People v. Letner and Tobin* (2010) 50 Cal.4th 99, 199.) If a prosecutor has evidence providing a good faith belief in the existence of a fact, then the prosecutor is entitled to question the witness on the subject. (See *People v. Lucas* (1995) 12 Cal.4th 415, 467.) Mother

11

testified during direct examination that Camunas's doctor told the family that his schizophrenia was caused by marijuana use. Based on this testimony, the prosecutor was entitled to at least inquire into the subject matter to clarify Mother's statement.

We recognize that once Mother answered this question and provided clarification, it was unnecessary for the prosecutor to repeat the question several more times and to continue to dwell on this subject matter. But there is nothing in the record showing the prosecutor's questions were deceptive or constituted reprehensible conduct that would support a finding of prosecutorial error or misconduct. Moreover, to the extent the prosecutor may have overly emphasized Mother's testimony regarding the schizophrenia-causation issue, the court's comments to the prosecutor made clear to the jury that the prosecutor's questions were not based on any medical or expert opinion. Further, the question regarding the cause of Camunas's mental illness was a collateral issue. The jury was instructed it could consider Camunas's mental illness to determine whether he acted with the requisite intent or mental state, and the instruction did not contain any limitations regarding the cause of the mental illness. (CALCRIM No. 3428.)[5] Thus,

_____

5 As read to the jury, this instruction stated: "You have heard evidence the defendant may have suffered from a mental disease, defect, or disorder. You may consider this evidence for the limited purpose of deciding whether, at the time of the charged crime, the defendant acted or failed to act with . . . intent or mental state required for that crime. [¶] The People have the burden of proving beyond a reasonable doubt that the defendant acted or failed to act with the required intent or mental state, specifically: [¶] As to [the robbery count], the intent to permanently deprive the owner of his or her property; [¶] As to [the assault count], an awareness of facts that would lead a reasonable person to realize that his act by its nature would directly and probably result in the application of force to someone; [¶] And as to [the burglary count], the intent to commit a theft when entering a building. [¶] If the People have not met this burden, you

12

even assuming Camunas's voluntary behavior somehow caused his mental illness, this was not a relevant consideration under the jury instructions and we presume the jury followed those instructions.

Additionally, it was essentially undisputed at trial that the connection between marijuana and schizophrenia is that the drug use can exacerbate schizophrenia symptoms or disease, and not that it is a *cause* of the illness. We reject the notion that the prosecutor's references to Mother's hearsay testimony about what Camunas's psychiatrist told her in March 2014 would have altered the jury's understanding of this undisputed fact. And the prosecutor's questions, on balance, provided a strong potential benefit to the defense. By repeatedly delving into the possible cause of Camunas's mental illness, the prosecutor gave Mother the opportunity to elaborate on Camunas's symptoms and illness, strengthening the defense arguments regarding Camunas's mental defects. There was no prejudicial error.

C. *Prosecutor's Statements Regarding Camunas's Current Diagnosis*

1. *Factual Summary*

During her closing argument, the prosecutor first detailed the evidence supporting that Camunas committed the charged crimes. The prosecutor then stated "[w]e need to talk about the elephant in the room"—the evidence of Camunas's mental illness. The thrust of this latter argument was to urge the jury to view the objective manifestation of

---

must find the defendant not guilty of the crime of robbery as charged in count . . . 1 . . . ; the [assault crime] as charged in count 2 . . . , [and] burglary . . . as charged in count 3 . . . ."

13

Camunas's conduct (as seen on the store security videotape and related by the various prosecution witnesses), and not to be improperly swayed by evidence of Camunas's mental health issues.  The prosecutor additionally referred to Dr. Lehman's opinions that at the time of the incident Camunas did not suffer from schizophrenia, and instead was in the "early onset" phase of the disease.

During this discussion, the prosecutor briefly questioned the accuracy of Camunas's current diagnosis, stating:

> "*This is a very difficult diagnosis.  Experts in this field even disagree.  The defendant's current doctor [Dr. Alex], currently as recently as 10 days ago, has his current diagnosis is major depression, anxiety disorder and a psychotic disorder.  [¶]  The person treating him and seeing him consistently doesn't even go to the point where he says schizophrenia.*"  (Italics added.)

Immediately after this comment, the prosecutor said:  "But, again, this does not matter because we're talking about [what occurred] in April [2013]" and told the jury that it "did not need to decide [Camunas's] diagnosis."  The prosecutor then spoke about the objective manifestation of Camunas's conduct while he was committing the offenses and argued that Camunas had the intent to commit the offenses despite his mental health issues.

After her argument, outside the presence of the jury, the court expressed concern that both counsel were taking "liberties" with Dr. Alex's current diagnosis because neither counsel had actually spoken with him.  The court stated it believed the prosecutor was arguing that Camunas "doesn't suffer from paranoid schizophrenia," and that this argument was not based on any reasonable inferences from the evidence.  The prosecutor

14

disagreed that was her argument, stating she was merely suggesting that experts may disagree on a schizophrenia diagnosis, and also noted "that [Dr. Alex] could have been more specific and chose not to be in this letter that he specifically wrote."

In her final argument, the prosecutor returned to the intent issue, directed the jury's attention to the jury instruction on mental disease or defect (CALCRIM No. 3428), and discussed Dr. Lehman's testimony that although Camunas *currently suffers from schizophrenia*, he was suffering only from the "early onset" stage of the disease in April 2013. The prosecutor also highlighted Dr. Lehman's testimony that individuals with schizophrenia can make decisions and commit crimes, and that although Camunas's actions were "bizarre," the objective evidence showed he intended to steal the property and knew what he was doing when he chased Nix.

## 2. *Analysis*

Camunas contends the prosecutor committed misconduct by suggesting in her closing argument that he did not suffer from schizophrenia at the time of trial. The contention is forfeited because Camunas's counsel did not object to the argument and ask for an admonition. (See *People v. Seumanu, supra*, 61 Cal.4th at p. 1339.)

Even if Camunas preserved the issue, the argument is without merit. The prosecutor's challenged comments concerned the contents of Dr. Alex's letter regarding Camunas's diagnosis at the time of trial (two years after the commission of the charged crimes). In his letter, Dr. Alex did not directly state that Camunas suffers from schizophrenia. He instead said this diagnosis was made by a doctor at Aurora hospital and by a therapist. In the letter, Dr. Alex identified Camunas's current diagnoses as

15

"major depression, generalized anxiety disorder and psychotic disorder."  Although there was evidence showing schizophrenia falls within the rubric of a "psychotic disorder," it was not error for the prosecutor to briefly point out the ambiguity in the letter regarding the current schizophrenia diagnosis.  The prosecutor's argument about Dr. Alex's letter fell within the prosecutor's wide latitude to vigorously argue the case and to make fair comment upon the evidence during closing argument.  (See *People v. Peoples* (2016) 62 Cal.4th 718, 797; *People v. Sandoval* (2015) 62 Cal.4th 394, 439; *People v. Dykes* (2009) 46 Cal.4th 731, 768.)

In any event, in the remainder of her argument, the prosecutor essentially conceded the *current* schizophrenia diagnosis, but argued this diagnosis did not preclude the jury from finding Camunas had the requisite intent to commit the crimes, particularly because Camunas's expert conceded that Camunas did not suffer from schizophrenia in April 2013, and instead suffered only from an early onset version of the disease, and that even assuming he had the disease, Camunas was capable of engaging in goal directed behavior.

Finally, any error was harmless.  (*Chapman v. California* (1967) 386 U.S. 18, 24; *People v. Watson* (1956) 46 Cal.2d 818, 836.)  The trial court instructed the jury that the attorneys' closing statements were not evidence and that if anything the attorney said conflicted with the evidence or the court's instructions, the jury must independently consider the evidence and follow the court's instructions.  The jury had the opportunity to examine Dr. Alex's letter and determine for itself the nature of Camunas's current diagnosis.  We presume the jurors understood and followed the trial court's instructions

16

regarding its consideration of the evidence and counsel's argument. (See *People v. Sanchez* (2001) 26 Cal.4th 834, 852.) Further, the issue of Dr. Alex's diagnosis was collateral to the main issues at trial. Regardless whether Camunas suffered from a more generalized psychosis condition or paranoid schizophrenia in 2015, the issue was whether his mental illness in April 2013 precluded him from forming the requisite intent or state of mind when he engaged in the alleged criminal acts.

## II. *Unconsciousness Instruction*

Camunas next contends the court erred in failing to sua sponte instruct the jury on unconsciousness. (CALCRIM No. 3425.)

Unconsciousness not resulting from voluntary intoxication is a complete defense to a criminal offense. (See *People v. Rogers* (2006) 39 Cal.4th 826, 887 (*Rogers*); *People v. James* (2015) 238 Cal.App.4th 794, 804 (*James*); *People v. Heffington* (1973) 32 Cal.App.3d 1, 8.) " 'Unconsciousness for this purpose need not mean that the actor lies still and unresponsive.' " (*People v. Gana* (2015) 236 Cal.App.4th 598, 609 (*Gana*).) " '[U]nconsciousness " 'can exist . . . where the subject physically acts in fact but is not, at the time, conscious of acting.' " ' " (*Ibid.*) This may occur as a result of a mental illness or mental defect. (*James*, at pp. 804-810.)

A trial court has a sua sponte duty to instruct on the unconsciousness defense if there is substantial evidence to support the defense. (*Rogers, supra*, 39 Cal.4th at p. 887; see *People v. Ray* (1975) 14 Cal.3d 20, 25.) This duty arises if it appears the defendant is relying on the defense, or if there is substantial evidence supporting the defense and the defense is not inconsistent with the defendant's theory of the case. (*Rogers*, at p. 887.)

17

In this case, Camunas did not rely on an unconsciousness defense and the evidence did not warrant an instruction. There were no facts showing Camunas was unconscious at the time of the charged offenses. On the morning of the offense, Camunas's mother saw him crying in his room, and offered to take him shopping. Once his mother went into a different part of the house, Camunas secretly took his parents' car and drove to a nearby Target store. He then engaged in a multi-step process of taking goods from the store. He walked into and out of the store three times, taking items that likely had value to this young man—stereo equipment, video games, and iPads—and he had the wherewithal to obtain a tool from the hardware department to open the locked iPads case. He later chased after the store manager who was reporting Camunas's actions on a walkie-talkie. These events do not support a reasonable inference that Camunas was unconscious at the time, in the sense that he had no control over, or awareness of, his actions.

We reach the same conclusion even when crediting Camunas's evidence that he was suffering from substantial mental illness at the time he committed the offenses. Mother and Camunas's sister testified about Camunas's mental health problems, including his hearing voices, depression, and inability to engage with others. Dr. Lehman opined that Camunas suffered from a pre-schizophrenia condition at the time, and that this condition could have resulted in his acting in an illogical, strange, and bizarre fashion. But neither Camunas's family members nor Dr. Lehman stated or suggested that Camunas was wholly unaware of his actions or had no control over his actions while he was at the Target store.

18

The fact that a person acts in an illogical manner does not equate with unconsciousness. In this regard, this case differs from the decisions relied upon by Camunas. (See, e.g., *James, supra*, 238 Cal.App.4th 794; *Gana, supra*, 236 Cal.App.4th 598.) In *Gana*, the defense expert testified that the defendant was manifesting " 'a delirium' " during which she was experiencing a " 'fluctuating level of consciousness.' " (*Gana*, at p. 610.) In *James*, the defendant was unresponsive to police officer commands, and expert opinion established the defendant was "experiencing a severe psychotic episode" *and* he " 'did not have awareness of what took place' during the incident." (*James*, at p. 810.) Here, the undisputed evidence showed that Camunas responded to officer commands and was aware of the relevant events.

Further, the absence of an unconsciousness instruction "is not prejudicial if ' "the factual question posed by the omitted instruction was necessarily resolved adversely to the defendant under other, properly given instructions." ' " (*Gana, supra*, 236 Cal.App.4th at p. 610.) Camunas's central defense was that he did not form the requisite intent to commit any of the defenses because of his mental condition. The court instructed the jury it could consider the evidence of Camunas's "mental disease, defect or disorder" in determining whether the People met their burden to prove Camunas acted or failed to act with the required intent or mental state with respect to each of the charged crimes. (See CALCRIM No. 3428.) And the jury was told that if Camunas did not act with the requisite intent or mental state based on his mental illness, "you must find the defendant *not guilty*" of the robbery, assault, and burglary crimes. (Italics added.)

19

Given this instruction, the evidence, and counsel's arguments, the jury had the full opportunity to consider Camunas's mental state defense and it necessarily rejected the notion that Camunas had no conscious awareness of his actions when he committed the offenses. By finding Camunas guilty, the jury found the prosecution proved beyond a reasonable doubt the allegations that Camunas acted with the requisite state of mind and intent in committing the offenses and was not unconsciousness at the time. Accordingly, even if the court erred in failing to instruct on unconsciousness, the error was harmless.

### III. *Court's Authority to Strike Offense*

Camunas contends the court erred because it did not realize it had the authority to dismiss the robbery conviction under section 1385.

### A. *Factual Background*

At the sentencing hearing, the trial judge spoke at length about his concern and empathy for Camunas's situation and his mental health condition. The court expressed its view that the prosecution had overcharged the case, particularly with respect to the robbery charge and had failed to engage in a meaningful plea bargaining process. The court emphasized that Camunas's mental illness had been improperly diagnosed at the time he committed the charged offenses, and that Camunas was not at fault for his disease.

During this discussion, the court made clear it did not view the case as a robbery case, and expressed considerable unease with the fact that the robbery would constitute a strike under California's Three Strikes law and Camunas would "[have] to live with" the strike "his entire life." The court stated a robbery strike would impose a significant

20

burden on Camunas's future prospects, noting it would be difficult for Camunas to find employment: "That is the problem that I have. It is already taking somebody who is going to have a difficult life to begin with and really needs continued care and treatment. . . . He's been hamstrung now even further as a result of this case. [¶] . . . [T]he idea that he has to basically be somebody that we have to label as a robber with a strike, No. The designation doesn't fit him and these facts don't fit."

On the other hand, the court acknowledged the evidence supported the jury's findings and the jury had the full opportunity to consider Camunas's mental health defense but found he acted with the requisite intent. The court indicated that during trial it had conducted independent legal research and had concluded that the evidence supported a robbery conviction based on an *Estes*-robbery theory. (*People v. Estes* (1983) 147 Cal.App.3d 23, 27.)[6] The court also commended the Target employees for following their security directives, and stated that they were not responsible for Camunas's criminal behavior.

At the conclusion of this discussion, the court stated: "And before I impose judgment, I will just make it very clear. If I could reduce the robbery, I would. I can't. If I could, I would and I would do it in a second and . . . [my comments] in the last hour . . . will bear out why. [¶] Anybody wants to look at it and [I] basically encourage them

---

6        Under *Estes*, "a robbery occurs when defendant uses force or fear in resisting attempts to regain the property or in attempting to remove the property from the owner's immediate presence regardless of the means by which defendant originally acquired the property." (*Estes, supra*, 147 Cal.App.3d at pp. 27-28.)

to look at this record, look at the court's statements. And anybody then can judge my comments in this particular case."

Based on its review of the entire record and the "substantial mitigation" associated with Camunas's mental illness, the court found the appropriate sentence would be to place Camunas on three years' summary probation. The court noted that Camunas has "incredible family support" and Camunas has done well living with his family during the two years after committing the offenses. The court also reduced the burglary conviction to a misdemeanor.

## B. *Analysis*

A court abuses its discretion if it erroneously believes it had no discretion or misunderstands the extent of the discretion. (See *People v. Superior Court (Romero)* 13 Cal.4th 497, 530, fn. 13; *People v. Marquez* (1983) 143 Cal.App.3d 797, 803.) Relying on this principle, Camunas contends the court abused its discretion because its comments at the sentencing hearing indicate it wanted to dismiss the robbery offense but believed it had no authority to do so. Camunas maintains the court had the authority to dismiss the offense under section 1385, subdivision (a), which provides: "The judge . . . may, either on his or her own motion or upon the application of the prosecuting attorney, and in furtherance of justice, order an action to be dismissed."

There was no abuse of discretion. Having carefully reviewed the record, we are confident the court fully understood the scope and extent of its discretion. The court never spoke of *dismissing* the robbery count; it referenced only its inability to "reduce" the robbery to a lesser offense. Although the court expressed its disagreement with the

22

manner in which the district attorney's office charged the case and handled the plea bargaining and said it wished it could *reduce* the robbery count, the court's comments do not support that it would have struck or dismissed the robbery conviction.

Camunas argues that we should interpret the court's comments to mean it would have done "anything within its power to *reduce the burden* on appellant resulting from this case." (Italics added.) Camunas misreads the record. The court indicated it desired to "*reduce the robbery*" (to a misdemeanor or nonstrike count), but never said or suggested it had any desire to entirely strike the conviction. (Italics added.) The court was correct there is no procedure for reducing a robbery to a misdemeanor or eliminating the potential future burden of a current robbery being later pled as a strike. The focus of the court's remarks was on its desire to minimize the potential consequences of Camunas's criminal acts on his future life. The court achieved this objective by imposing summary probation, discussing with the family the strong need to continue Camunas's mental health care and medications, and presenting its views of the case for later consideration in the event Camunas suffers a subsequent felony conviction and that sentencing court is asked to strike this robbery conviction.

The trial judge has substantial criminal trial experience and made clear it had considered all the facts and circumstances as required by law, and took time to carefully review the case before imposing the sentence. Although it may have disagreed with the jury's verdict, it was satisfied the verdict was supported by the law and the facts of the case. The trial court's comments about wishing it could reduce the robbery to diminish the effect of the conviction on Camunas's future cannot be fairly interpreted to mean the

23

court failed to appreciate the scope of its discretion. Viewed in context, the court was acknowledging it could not reduce the robbery conviction to a lesser nonstrike conviction and understood it would not be proper to dismiss the robbery conviction solely to relieve Camunas from having a strike conviction on his record.

Although the trial court expressed substantial compassion for Camunas, the court accepted the fact that the jury found beyond a reasonable doubt that Camunas committed the robbery. Absent any contrary indication in the record, we are required to presume judges know and understand the law. (*People v. Galvez* (2011) 195 Cal.App.4th 1253, 1264.) The court's expressions of compassion and sympathy do not support a finding that this presumption has been rebutted.

## DISPOSITION

Judgment affirmed.


HALLER, Acting P. J.

WE CONCUR:


McDONALD, J.


IRION, J.

24