Filed 5/5/22  P. v. Mendoza CA4/2

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

|  |  |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>VICTOR MENDOZA,<br><br>    Defendant and Appellant. | E076501<br><br>(Super.Ct.No. RIF1802471)<br><br>OPINION |

APPEAL from the Superior Court of Riverside County.  Samuel Diaz, Jr., Judge.

Affirmed in part, reversed in part, and remanded with directions.

Sharon G. Wrubel, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Arlene A. Sevidal, Acting Senior Assistant Attorney General, and Charles C. Ragland and Joseph C. Anagnos, Deputy Attorneys General, for Plaintiff and Respondent.

1

Defendant Victor Mendoza used violence of some kind to force an aged and sickly friend to leave his home, walk several blocks, and go into an open field; the victim's blood was later found strewn throughout his kitchen/living room. Once in the field, the victim was killed with 12 to 15 blows from a machete.

Defendant denied inflicting the fatal blows. He testified that a person he knew only as "Miklo" forced him to bring the victim to the field by threatening to kill defendant's family. Supposedly Miklo told defendant that he merely wanted to question the victim about allegations that the victim was a child molester, but Miklo killed the victim immediately upon arrival instead.

After a jury trial, defendant was found guilty of first degree murder, on a felony-murder theory (§§ 187, subd. (a), 189, subds. (a), (e)), with a kidnapping-murder special circumstance (§ 190.2, subd. (a)(17)(B)). He was sentenced to life in prison without the possibility of parole, along with the usual fines, fees, and ancillary orders.

Defendant contends that the trial court erred by:

(1) Excluding evidence that defendant had been told that the victim had molested his own grandchildren.

(2) Refusing to give CALCRIM No. 224, concerning the sufficiency of circumstantial evidence.

(3) Failing to give a flight instruction.

(4) Imposing a $10,000 restitution fine without holding a hearing on defendant's ability to pay and without sufficient evidence of his ability to pay.

2

We agree that the trial court erred both by refusing to give CALCRIM No. 224 and by failing to give a flight instruction, but the errors were harmless. We find no other error affecting the conviction. Finally — once we treat certain arguments that the People have failed to raise as forfeited — we conclude that there was insufficient evidence of defendant's ability to pay the restitution fine. Accordingly, we will remand with directions to reconsider the imposition and the amount of the restitution fine; otherwise, we will affirm.

I

STATEMENT OF FACTS

A. *Prosecution Evidence*.

1. *Background*.

As of 2018, victim Larry Valverde was 65 years old. He was "short and somewhat frail." He suffered from diabetes and kidney failure; he was on dialysis. He lived on Sunnymead Boulevard in Moreno Valley.

Defendant lived two doors away, with his mother. His children lived with his ex-girlfriend, a couple of miles away. Defendant and Valverde had been friends and neighbors for five or six years.

Valverde's adult daughter Aryn lived across the street from Valverde. She would check on him "sporadically throughout the day[.]" She was in a relationship with defendant's brother.

On May 16, 2018, defendant moved in with Valverde.

3

### 2. *May 18-19: The Night of the Crime.*

On May 18, around 9:00 or 10:00 p.m., Aryn was at Valverde's house briefly to borrow his TV remote control. Defendant and Valverde were there, along with one Tanya Gil.[1]

Surveillance video showed that at 11:37 p.m., the side door of Valverde's house opened. At 11:38 p.m., an interior light went on. At 11:49 p.m., the side door closed. At 11:51 p.m., it opened again. At 12:02 a.m., the front door opened; two "silhouettes" came out. At trial, Aryn identified them as defendant and her father.

One was holding something white — possibly a paper towel — up to his face. The other was holding something under his right arm. They then "walk[ed] out of frame." Surveillance video from a different camera showed two people walking west on Sunnymead Boulevard toward Graham Street.[2]

Sometime in the middle of the night, Aryn let her dog out into her back yard; she noticed that Valverde's lights were on and there was a roll of paper towels on a chair on the front porch.

On May 19, at about 6:00 a.m., defendant showed up at the home of his friend, Ignacio Cortez. Defendant looked tired; his clothing looked as if "he had been rolling

---

[1] Gil died before trial in a car accident.

[2] The video has not been transmitted to us. According to the trial court, however, it showed one person limping and another person pushing him.

4

around in dirt[.]" He asked for a shower and a change of clothes. Cortez did not let him shower but did give him clothes.

Around 7:00 a.m., when Cortez had to go on an errand, defendant asked to go with him. After the errand, Cortez dropped defendant off at a location that defendant specified.

Also around 7:00 a.m., Aryn went to her father's house. The front door was closed. When she opened it, she found that "[t]he whole front entrance . . . was covered in blood." No one was inside. Valverde's wallet and cellphone were on his bed. Aryn called the police.

At about 8:00 a.m., an officer arrived at Valverde's house. There was blood in the entryway and "throughout" the kitchen/living room area, "on the couch, on the floor." There were "a few" bloody paper towels. There was also blood on the back porch, along with more bloody paper towels. There was "[a] large amount of blood" on, inside of, and outside of a side door. There were two bloody shoeprints.

One of Valverde's shirts and one of defendant's shirts were on the floor by the side door. On a chair in the front yard, there was the roll of paper towels that Aryn had seen, with some blood on it.

A trail of blood droplets on the sidewalk led west down Sunnymead Boulevard, then north on Graham, then west again on Olivewood Plaza. It ended at an open field. There was a particularly large deposit of blood outside an AutoZone.

3. *May 20: The discovery of Valverde's body*.

On May 20, the police tracked the blood trail further, into and through the field. It petered out near a homeless encampment. They continued to search the area. In some brush, they found a serrated machete, with what appeared to be blood on the blade. Then, about 30 feet away, in a ditch, they found Valverde's dead body.

There were parallel cuts on the back of his head and neck. These had been inflicted by some 12 to 15 separate blows from a "chop-type" weapon, such as a machete. One "very large" cut had fractured the back of his skull and severed his spinal cord as well as the carotid and vertebral arteries.

Valverde had also been hit in the mouth, as shown by broken teeth and cut and bruised lips. His nose and one of his ribs were broken. There were smaller cuts and scrapes on his face, neck, and jaw.

One way his facial injuries could have occurred was if he was hit in the back of the head while lying face down on dirt or a similarly rough surface.

If Valverde's nose was broken while he was at his house, if it "bled profusely," and if he remained there for a "significant amount of time," that could account for the blood found inside the house.

The cause of death was "multiple sharp and blunt impact injuries." At one point, however, Valverde had been strangled, as shown by petechial hemorrhages, a linear scrape on his neck, and bruised neck muscles.

Cortez turned over defendant's clothes — a hoodie jacket, a shirt, pants, and shoes, as well as his wallet — to the police. Blood was found on the jacket and on the pants. DNA analysis showed that it was Valverde's blood. It was also Valverde's blood on the sidewalk. The pattern on the soles of defendant's shoes matched the bloody shoeprints found. However, there was no blood on the shoes. Not enough DNA was found on the machete to be analyzed.

Also on May 20, defendant was arrested for an unrelated reason. He had no significant visible injuries. He voluntarily gave a statement about the murder to the police.

B. *Defense Evidence*.

Defendant testified that he had never met Tanya Gil before May 18, 2018. Around 11:00 p.m., Gil asked him to go to a party nearby; he agreed. She mentioned that she was going to meet up with a friend.

They walked across the street to a supermarket. Gil walked up to a man who was sitting on the curb outside the store. She introduced him as her friend Miklo[3] and said he was going to the party, too. Miklo asked for something to drink, so they went back to Valverde's house and gave him a glass of water.

While they were there, Gil and Miklo had a whispered conversation. Defendant heard Gil tell Miklo that they should "kill [Valverde] inside of his house" because he had

_____

[3]     Miklo's real name was Dillon Hardy. The information charged defendant and Hardy jointly with murder. Their trials were later severed.

7

allegedly committed child molestation. On cross-examination, he testified that they said "hurt," not "kill."

Defendant, Gil, and Miklo then left again, supposedly to go to the party. They walked along the route where the blood trail was later found. Just before the field, Gil left, supposedly to bring other friends to the party.

Defendant followed Miklo into the field. Near the homeless encampment, Miklo stopped. He pulled a machete out of his pants. It was not serrated. He threw defendant to the ground face down and swung the machete above defendant's head twice.

He said "they" had defendant's family, and if defendant did not bring Valverde back within 60 minutes, his "family was going to die." He explained that he wanted to question Valverde about an allegation that Valverde had molested one of defendant's children. He told defendant not to call the police or anyone else, or again, his family would die. Miklo picked a second, serrated machete up from the ground and gave it to defendant, to use to bring Valverde back.

Defendant already suspected that Valverde was molesting defendant's four-year-old daughter. A month earlier, he had gotten a voicemail from her, from a number he did not recognize. She was crying and saying, "Stop," "No," and "Ouch." He tried to call the number, but it was out of service. He called his ex-girlfriend, the child's mother, who said the child was at home and "it wasn't true." The next morning, he asked his daughter if anybody had touched her "private area"; she said no. Nevertheless, defendant was "[u]pset" with Valverde.

Defendant went back to Valverde's house, carrying the machete concealed in Miklo's sweater. When he arrived, he asked Valverde "if he ever molested [defendant's] kids." Valverde denied it, but defendant did not believe him because "[h]e kind of looked away."

Valverde got upset and punched defendant on the left cheek, "[n]ot so hard," two or three times. Defendant punched him back, two or three times, in the nose. Valverde fell; his nose was bleeding. According to defendant, all of the blood later found in the house was from Valverde's bloody nose. Defendant denied inflicting his mouth injury or punching him in the ribs

Defendant got paper towels to "clean up the mess." There were two shirts on the floor because Valverde took off his own shirt, and defendant gave him one of his shirts to stop the bleeding.

Defendant then told Valverde what had passed between him and Miklo. Defendant did not bring out the machete until Valverde asked him what was in the sweater. He did threaten to use the machete on Valverde. However, he also promised to use it to protect Valverde. They discussed calling the police, but defendant refused because he was afraid for his family. Although Valverde was afraid, eventually he agreed to go with defendant; he said, "For the safety of your children, let's go see what is going on."

9

They went out the side door so they could leave with no one seeing; however, Valverde could not go through or over the back fence, so they went back inside and out the front door.

Near the AutoZone, Valverde changed his mind about going and "kind of threw himself to the [ground]." They argued. Defendant was afraid that time was running out, so he kicked Valverde twice in the groin. He kept begging Valverde to get up. Finally, Valverde did, and they resumed walking.

They saw a policeman in a patrol car, "moving very slowly." They walked up to it, screamed, and yelled for help. The officer just rolled up his window, turned on his spotlight, and aimed it into the field. Defendant concluded that the police "were corrupt and probably in on it."

Near the homeless encampment, they encountered a Black man. He yelled, "Get out of my house" and swung a machete at them. They tried to back away but fell. As defendant got up, he realized that Miklo was hitting Valverde with a machete. Miklo hit Valverde a total of three or four times. He did not hit Valverde in the mouth or strangle him. He said, "Something for Mom and Pop's shop." Defendant had dropped the machete that Miklo had given him and could not find it in the dark.

Defendant conceded that the Black man went back into his tent and had nothing to do with the attack.

Once again, Miklo threw defendant to the ground and swung the machete above his head. He then ordered defendant to follow him.

10

Apparently the police had obtained surveillance video photos of defendant with Miklo at several locations in Moreno Valley. Defendant testified that he spent the night following Miklo around, as ordered, including to those locations.

First, they walked to a sewer under a bridge. There were "a couple [of] other people" in the sewer; they appeared to know Miklo. Miklo changed into some clothes that he had stashed there.

Miklo then sent defendant to a flower shop to get a spray can and a trash bag that Miklo said he would find there. Miklo wanted the spray can so he could "tag . . . the sewer," which somehow would prevent "arous[ing] any suspicion[.]" Defendant found the bag but no spray can.

Miklo left the machete behind in the sewer as they walked to a business complex, where Miklo put something in a trash can. They walked up Nita Street, where Miklo met with another person.

Then they walked down Hemlock Street to a trash can in a parking lot. There were two men and two girls there. Miklo knew one of the men and traded hats with him.

Defendant and Miklo then walked to a Valero gas station. Photos taken at 4:37 a.m. showed defendant and Miklo together at the gas station, as well as a silver van and a nearby police car. According to defendant, Miklo gave gloves and other stuff that he was using at the time of the murder" to a "guy"[4] who was driving a silver van. The

---

[4]     Defendant also referred to the guy as Miklo's "roommate."

11

guy asked "if everything was done already." Miklo said, "Yes." This made defendant think Valverde was killed "over a drug debt that he owed."

They went to a Bank of America parking lot, where they were also photographed together.

Then they went to a Papa John's, where they were photographed again around 4:00 a.m. A truck pulled up and honked; an occupant called to Miklo. Miklo then told defendant "everything was going to be okay, . . . to just get away from Moreno Valley [and] never come back."

Defendant walked to Cortez's house, where he got a change of clothes and where he left his clothes, shoes, and wallet. He had Cortez drop him off at the home of his friend Miguel Lendo. He did not ask Cortez to drop him off at his family's home because he "was still a little scared." He slept the whole day and night at Lendo's.

On May 20, defendant went first to Aryn's house and then to his mother's house, but no one was home. Only then did he go to his ex-girlfriend's home, "[t]o check if they were alive or not." At his direction, his ex-girlfriend called the police. When he was arrested, he told the police what had happened.

Defendant admitted leaving shoeprints in Valverde's house. He could not explain why no blood was found on his shoes; he denied washing them.

C.      *Rebuttal.*

1.      *Defendant's prior inconsistent statements.*

Defendant had told police that, when Miklo and Gil were at Valverde's house "Miklo pull[ed] out a machete, put it on the table[,] and sa[id], Let's end [Valverde] right now[.]"

Rather than swinging a machete over defendant's head, defendant said that Miklo pointed to an X on the ground, told him to put his face there, and threatened to "shav[e]" him.

Defendant admitted hitting Valverde in the ribs. When Valverde would not go, defendant kicked him, then dragged him out of the house. Outside the AutoZone, defendant kicked Valverde in the groin not twice but four times.

Defendant said they saw a police officer, but he did not say they tried to get help from him.

He said Valverde was attacked by six people.

He said a friend later told him that Valverde was actually killed because he owed money for heroin.

2.      *Testimony of Vanessa Melendez.*

Vanessa Melendez testified that on May 19, at 2:00 or 3:00 a.m., she was in an alley smoking methamphetamine with some friends when Miklo and defendant showed up. Miklo introduced defendant as his friend. Defendant and Miklo used some of the methamphetamine. One of her friends traded hats with Miklo.

13

According to Melendez, Miklo liked knives and had a lot of different ones; however, she had never seen him with a machete.

## II

## LIMITING EVIDENCE THAT THE VICTIM

## HAD BEEN ACCUSED OF CHILD MOLESTATION

Defendant contends that the trial court erroneously excluded evidence that he had been told that Valverde had molested his own grandchildren.

A.     *Additional Factual and Procedural Background*.

     1.     *The motion in limine*.

The prosecution filed a motion in limine to exclude evidence of the fact that Valverde had been accused of molesting his grandchildren, as more prejudicial than probative. They represented that Valverde "was not convicted, charged, or arrested . . . ." They argued that this evidence might be relevant to Miklo's motive for the murder, but it was irrelevant to defendant's own claimed motive, which was duress. They also argued that it would confuse the jury and take up undue time.

The argument on the motion was very confusing, because it involved four separate out-of-court statements regarding two separate molestation allegations:

(1) A statement by Aryn, as much as two years before the murder, that Valverde had molested his own grandchildren, including her son[5] (Aryn's statement).

---

    **5**     Aryn's son was defendant's nephew.

(2)  A statement by defendant's daughter, in a phone call sometime before the murder, to the effect that Valverde had molested her (the child's statement).

(3)  A statement by Miklo and Gil, at Valverde's house, that they suspected Valverde of molesting his own grandchildren (Miklo's house statement).

(4)  A statement by Miklo, in the field, that he suspected Valverde of molesting defendant's daughter (Miklo's field statement).

Defense counsel said at first that he wanted to introduce only Aryn's statement because, when taken with Miklo's house statement, it showed defendant's motive.  Then, however, he indicated that he also wanted to introduce the child's statement because, when taken with Miklo's field statement, it, too, showed defendant's motive.

The prosecution objected to all of this evidence.

The trial court ruled that it would allow evidence of only "one incident," evidently meaning one incident of molestation.  Defense counsel responded,  "[I]t's both the incidents that caused the motivation."  The trial court, however, adhered to its ruling:  "If you want both of them to come in, I'm saying it's too prejudicial."

2.      *Proceedings during trial*.

Defendant testified that, at Valverde's house, Miklo and Gil told him about "[s]ome allegations of some child molestation."  Then, in the field, Miklo told him to bring Valverde back "so they can question him about these allegations."

Defendant then volunteered that, while in the field, Miklo told him that Valverde had allegedly molested *both* Aryn's children *and* defendant's own children.  The

15

prosecutor objected based on the pretrial ruling. The trial court struck the testimony regarding Aryn's children and directed defense counsel to admonish defendant not to mention the allegation regarding Aryn's children.

Defendant then testified to the child's statement and Miklo's field statement (both about molestation of his own child).

On cross-examination, the prosecutor impeached defendant's testimony about the child's statement. He asked (1) what number she was calling from (unknown); (2) whether he called the number back (it was out of service); (3) whether defendant believed the molester placed the call while the molestation was going on ("It could have been"); (4) whether defendant called the police (no, he called his ex-girlfriend, and she said his daughter was home and safe); (5) whether he questioned his daughter (yes, she denied any molestation); and (6) whether defendant kept the voicemail (no).

Defense counsel then asked again to introduce evidence of Aryn's statement, to "bolster[]" defendant's credibility. The trial court adhered to its ruling.

B.    *Discussion*.

The trial court has discretion to exclude otherwise admissible evidence if it would be more prejudicial then probative. (Evid. Code, § 352.) Prejudice, for this purpose, includes "'evok[ing] an emotional bias" (*People v. Johnson* (2019) 8 Cal.5th 475, 521), "undue consumption of time," "confusing the issues," or "misleading the jury." (Evid. Code, § 352.)

16

"We review a trial court's decision to admit evidence over an Evidence Code section 352 objection for abuse of discretion. [Citation.]" (*People v. Powell* (2018) 5 Cal.5th 921, 961.) "'"[A] trial court does not abuse its discretion unless its decision is so irrational or arbitrary that no reasonable person could agree with it."'" [Citation.]" (*People v. Charles* (2015) 61 Cal.4th 308, 333.)

Evidence that Valverde was accused of child molestation was undoubtedly prejudicial. Such a charge is uniquely inflammatory. Child molesters are near-universally despised, even in prison. Jurors would be tempted to minimize or ignore the evidence against defendant out of a sense that Valverde somehow had it coming. This was a risk even if the evidence was not admitted for its truth and even if the jury was so instructed.

The trial court could properly reason that two alleged instances of child molestation were far more inflammatory than one. If the jurors learned that Valverde had been accused of child molestation twice, two years apart, by unrelated accusers, they were likely to conclude that he was, in fact, a child molester.

The trial court could properly have excluded evidence of *both* instances of molestation. The prosecution's original argument was correct: Child molestation may have been *Miklo's* motivation, but *defendant's* motivation was duress. Thus, this evidence was more prejudicial than probative. In fact, evidence that defendant knew that Valverde was suspected of child molestation — especially molestation of defendant's own child — actually *undercut* his claim of duress. It suggested that no duress was

17

necessary; inferably he had reasons of his own to bring Valverde to the field to be questioned or even killed.

Nevertheless, the trial court bent over backwards to allow defense counsel to present his theory of the case. It let him introduce evidence of one alleged instance of child molestation. It even let him pick which one. Reasonably, he chose the one most likely to affect defendant — molestation of his own child.[6]

Unfortunately for defense counsel, defendant's testimony about that incident was destroyed on cross-examination.

Defendant essentially argues that the trial court had a duty to help him rehabilitate his lost credibility; if he had been allowed to testify about the allegation involving Aryn's child, that might have explained why he interpreted the phone call — even though it was very inconclusive — as meaning that Valverde was molesting his daughter.

Admittedly, at that point, the allegation involving Aryn's child took on some added probative value — but not much. Defendant's account of the phone call remained vague, inconclusive, and frankly not very believable. His ex-girlfriend assured him that

---

[6] Defense counsel was probably relying on defendant's statement to the police, which was significantly different from his testimony at trial. In it, he said he received three voicemails, starting at 3:00 a.m. In the first, Valverde made a characteristic grunting noise. In the second, his daughter said, "Daddy." In the third, he heard the grunting noise and his daughter crying and saying, "Daddy." When he confronted Valverde, Valverde denied everything, but then he got up and left and stayed away for three days. Aryn confirmed that defendant's children had been at Valverde's house.

18

his daughter was at home and safe; his daughter denied being touched. He did not even bother to keep the voicemail.

At the same time, there was other evidence of why he interpreted the phone call the way he claimed that he did — namely, in the field, Miklo told defendant that Valverde was suspected of molesting defendant's daughter. Based on Miklo's field statement, it would be reasonable that defendant might think back on the phone call and conclude that it was evidence of molestation by Valverde. Miklo's field statement, which did come in, had much the same effect as Aryn's statement would have.

Finally, it remained true that two alleged incidents of molestation were more prejudicial than just one. Arguably, the trial court could have struck a different balance, but we cannot say that it abused its discretion.

In sum, the trial court's initial ruling was not erroneous. The fact that defendant's subsequent testimony was unconvincing and impeached did not require it to change that ruling.

### III

### REFUSAL TO GIVE CALCRIM NO. 224

### REGARDING THE SUFFICIENCY OF CIRCUMSTANTIAL EVIDENCE

Defendant contends that the trial court erred by refusing to give CALCRIM No. 224, concerning the sufficiency of circumstantial evidence.

The People concede that "[t]here does appear to have been error," but they contend that "the error was harmless beyond a reasonable doubt in view of other properly given instructions."

A.     *The Instructions*.

CALCRIM No. 223 explains what circumstantial evidence is; it then says:

"Both direct and circumstantial evidence are acceptable types of evidence to prove or disprove the elements of a charge, including intent and mental state and acts necessary to a conviction, and neither is necessarily more reliable than the other.  Neither is entitled to any greater weight than the other.  You must decide whether a fact in issue has been proved based on all the evidence."

CALCRIM No. 224 says:

"Before you may rely on circumstantial evidence to conclude that a fact necessary to find the defendant guilty has been proved, you must be convinced that the People have proved each fact essential to that conclusion beyond a reasonable doubt.

"Also, before you may rely on circumstantial evidence to find the defendant guilty, you must be convinced that the only reasonable conclusion supported by the circumstantial evidence is that the defendant is guilty.  If you can draw two or more reasonable conclusions from the circumstantial evidence, and one of those reasonable conclusions points to innocence and another to guilt, you must accept the one that points to innocence.  However, when considering circumstantial evidence, you must accept only reasonable conclusions and reject any that are unreasonable."

20

CALCRIM No. 704 is essentially identical to CALCRIM No. 224, except that it applies to "a special circumstance allegation" rather than to guilt or innocence.

B.      *Additional Factual and Procedural Background*.

Both sides requested CALCRIM No. 223 and No. 224.  The trial court said it would "give 223, not 224.  And give 223 in conjunction with 704."  It did not state its reasons on the record.  However, when it asked the prosecution to comment, the prosecutor cited *People v. Hines* (1997) 15 Cal.4th 997 (*Hines*).

C.      *Discussion*.

"'[A] trial court has a sua sponte duty to give [CALCRIM No. 224] in criminal cases "where circumstantial evidence is substantially relied upon for proof of guilt . . . ."'" [Citation.]"  (*People v. Burch* (2007) 148 Cal.App.4th 862, 870.)

*Hines* held that, when the trial court gave the predecessor of CALCRIM No. 224, regarding guilt, it was not "prejudicial error" to refuse to give the predecessor of CALCRIM No. 704, regarding a special circumstance allegation.  (*Hines*, *supra*, 15 Cal.4th at pp. 1051-1052.)  We accept that jurors will understand that an instruction that applies to "guilt[]" also applies to a special circumstance.  It does not follow, however, that they will understand that an instruction that is specifically limited to a special circumstance allegation also applies to guilt in general.  Thus, the trial court erred.

The error, however, was harmless.  As the People point out, the jury found the special circumstance true; the elements of the special circumstance were equivalent to the elements of felony murder.

21

The jury was instructed that felony murder required "that:

"One, the defendant committed kidnapping.

"Two, the defendant intended to commit kidnapping.

"Three, if the defendant did not personally . . . commit kidnapping, then a perpetrator committed kidnapping.[7]

"Four, while committing kidnapping, the perpetrator caused the death of another person.

"And five, the defendant was a major participant in the kidnapping.

"And six, when the defendant participated in the kidnapping, he acted with reckless indifference to human life." (CALCRIM No. 540B.)

It was also instructed that the special circumstance required that:

"One, the defendant committed kidnapping.

"Two, the defendant intended to commit kidnapping.

"Three, if the defendant did not personally commit kidnapping, then a perpetrator, whom the defendant was aiding and abetting before or during the killing, personally committed kidnapping.

---

**7**     Actually, the trial court misread this instruction, as requiring that "if the defendant did not personally *intend to* commit kidnapping, then a perpetrator committed kidnapping." (Italics added.)

Defendant does not contend that this was reversible error. The trial court's slip of the tongue was manifestly harmless, because, as we will discuss, in connection with the special circumstance, the jury was required to find that "the defendant intended to commit kidnapping."

"And four, the defendant or co-participant did an act that caused the death of another person." (CALCRIM No. 730.)

Moreover, if defendant was not the actual killer, the special circumstance also required that:

"[Five], the defendant's participation in the [kidnapping] began before or during the killing.

"[Six], the defendant was a major participant in the [kidnapping].

"And [seven], when the defendant participated in the [kidnapping], he acted with reckless indifference to human life." (CALCRIM No. 703.)

Consistent with these instructions, it has been held that felony murder and a felony-murder special circumstance have "the same elements of proof." (*People v. Farfan* (2021) 71 Cal.App.5th 942, 953-954.)

The erroneous failure to give an instruction is harmless when "'the jury necessarily resolved, although in a different setting, the same factual question that would have been presented by the missing instruction; [citation] in a manner adverse to defendant." (*People v. Wright* (2006) 40 Cal.4th 81, 99; see generally *id*. at pp. 98-99.)

Defendant hypothesizes that the jury may have erroneously found him guilty of felony murder and then "almost automatically" concluded that the special circumstance was true, without bothering to consider CALCRIM No. 704. This argument breaks the rule that "'[a]bsent some showing to the contrary, we presume the jury followed the court's instructions.' [Citation.]" (*People v. Krebs* (2019) 8 Cal.5th 265, 335.)

23

The Supreme Court rejected a similar argument in *People v. Gonzalez* (2018) 5 Cal.5th 186. There, the defendants were found guilty of first degree felony murder. (*Id.* at p. 194.) The trial court erroneously failed to instruct on first degree murder with malice or on the lesser included offenses of second degree murder, voluntary manslaughter, and involuntary manslaughter. (*Id.* at pp. 194-195.) The Supreme Court held that the error was harmless because the jury also found a robbery-murder special circumstance to be true, and thus implicitly but necessarily found that the defendant was guilty of first degree felony murder. (*Id.* at pp. 200-203.)

The defendants argued "that the felony-murder conviction 'essentially compell[ed]' the jurors to find the robbery-murder special-circumstance allegation true." (*People v. Gonzalez, supra*, 5 Cal.5th at p. 201.) The Supreme Court said that this argument "fail[s] to persuade." (*Ibid.*) It relied, in part, on "the presumption that juries understand and follow instructions . . . ." (*Ibid.*) It also noted that "[t]he trial court specifically instructed the jury to take the questions of felony murder and the special circumstance separately . . . ." (*Ibid.*) Here, similarly, the trial court instructed, "If you find the defendant guilty of first degree murder, you must also decide whether the People have proved that the special circumstance is true." (CALCRIM No. 700.)

Finally, defendant argues that the duress and necessity instructions (CALCRIM Nos. 3402, 3403) by their terms applied to a finding of guilt, and not to the special circumstance. Thus, he argues, the jury may have found the special circumstance true without considering these defenses.

As mentioned, however, the instructions on the special circumstance required the jury to find that defendant "committed kidnapping." The duress and necessity instructions were not limited to murder. In fact, as the prosecution's only theory of murder was felony murder, the broad general statements in those instructions — that "[t]he defendant is not guilty" if he acted under either duress or necessity — necessarily applied to the underlying kidnapping. Thus, in finding that the special circumstance allegation was true, the jury must have considered — and rejected — both duress and necessity.

We therefore conclude that the trial court's failure to give CALCRIM No. 224, although erroneous, was harmless.

IV

FAILURE TO INSTRUCT ON FLIGHT

Defendant contends that the trial court erred by failing to give a flight instruction.

CALCRIM No. 372, with the appropriate wording choices for this case, says: "If the defendant fled immediately after the crime was committed, that conduct may show that he was aware of his guilt. If you conclude that the defendant fled, it is up to you to decide the meaning and importance of that conduct. However, evidence that the defendant fled cannot prove guilt by itself."

Neither side requested a flight instruction, and the trial court did not give one. A trial court, however, has a duty to give a flight instruction sua sponte whenever "evidence

25

of flight of a defendant is relied upon as tending to show guilt . . . ." (Pen. Code, § 1127c; see also *People v. Najera* (2008) 43 Cal.4th 1132, 1139, fn. 4.)

"'In general, a flight instruction "is proper where the evidence shows that the defendant departed the crime scene under circumstances suggesting that his movement was motivated by a consciousness of guilt." [Citations.] "'[F]light requires neither the physical act of running nor the reaching of a far-away haven. [Citation.] Flight manifestly does require, however, a purpose to avoid being observed or arrested.'" [Citation.]' [Citation.]" (*People v. Leon* (2015) 61 Cal.4th 569, 607.) The instruction must be given when there is "'substantial evidence of flight . . . .'" (*People v. Pensinger* (1991) 52 Cal.3d 1210, 1245.) "The evidentiary basis for the flight instruction requires sufficient, not uncontradicted, evidence." (*People v. Richardson* (2008) 43 Cal.4th 959, 1020.)

The People argue that there was no substantial evidence of flight. They point out that, according to defendant's own account, he wandered around Moreno Valley with Miklo while Miklo encountered various acquaintances. After the stop at the sewer, they were largely in public; they were even photographed by multiple security cameras. All this time, Valverde's blood was on defendant's clothing.

This overlooks the fact that defendant did not go home. He did not go to Valverde's house, where he was then living. He knew that Aryn would come looking for her father, so by not going there, he was leaving her to confront the bloody scene, alone

and with no explanation.  He also did not go to his mother's home or the home of his ex-girlfriend and children.

Of course, defendant testified that he stayed with Miklo only under duress.  The jury, however, did not have to believe this, and on that view, staying with Miklo constituted flight.  In addition, even after Miklo bade him farewell, defendant *still* did not go home or to his mother's.  He did not go to the home of the mother of his children — even though Miklo had supposedly threatened to kill them — until the second day after the murder.  Instead, he went first to the home of his friend Cortez, so he could get rid of his bloody clothes, and then to the home of his friend Lendo.  It was reasonably inferable that this showed consciousness of guilt and thus constituted flight.

The People also argue, however, that the failure to give a flight instruction was harmless.  "[T]he standard of reversible error as applied to jury instructions is whether it is reasonably probable that a result more favorable to the defendant would have occurred had the correct instruction been given." (*People v. Burgener* (1986) 41 Cal.3d 505, 538, disapproved on other grounds in *People v. Reyes* (1998) 19 Cal.4th 743, 745, 748-754, 756; see also *People v. Turner* (1990) 50 Cal.3d 668, 695 [giving flight instruction was harmless under reasonable probability standard].)  Defendant cites no case holding that the failure to give a flight instruction was prejudicial, and our research has revealed none.

Appellants object more often to the giving of a flight instruction than to the failure to give one.  This is because the instruction calls the jurors' attention to any evidence that arguably shows flight and suggests that consciousness of guilt is a possible inference.

27

Thus, the failure to give a flight instruction can almost never be prejudicial. (*People v. Roy* (1971) 18 Cal.App.3d 537, 551 ["The instruction could have been more helpful to the prosecution than to the defendant."], disapproved on other grounds in *People v. Ray* (1975) 14 Cal.3d 20, 29-30, 32; *People v. Sheldon* (1967) 254 Cal.App.2d 174, 181 [omission of instruction "'was more favorable than harmful to'" defendant]; *People v. Williams* (1960) 179 Cal.App.2d 487, 491 [same].)

This is particularly true of the first part of the instruction, "If the defendant fled immediately after the crime was committed, that conduct may show that he was aware of his guilt." However, it is also true of the next part of the instruction, "If you conclude that the defendant fled, it is up to you to decide the meaning and importance of that conduct." The jury here was instructed, as usual, that "You must decide what the facts are. It is up to all of you, and you alone, to decide what happened . . . ." (CALCRIM No. 200.) This makes the same point, albeit more generally.

That leaves the part of the instruction that says, "evidence that the defendant fled cannot prove guilt by itself." Again, however, other instructions make the same point more generally, including the general instruction on proof beyond a reasonable doubt (CALCRIM No. 220), as well as other instructions requiring proof of particular matters beyond a reasonable doubt. (CALCRIM No. 704 [special circumstance], CALCRIM No. 1215 [absence of consent and absence of a reasonable belief in consent]; CALCRIM No. 3402 [absence of duress].)

28

Particularly on this record, there is no reasonable probability that the jury mistakenly believed it could infer guilt from flight alone. The evidence, the instructions, and the arguments of counsel would have made it well aware that it had to decide whether defendant was acting under duress or legal necessity.[8]

Defendant notes that the prosecutor argued that he spent hours with Miklo after the murder and that this proved that he was neither under duress nor in fear for his family. He argues that the absence of a flight instruction somehow led the jury to view this conduct as evidence of consciousness of guilt when it was really evidence of duress. Even with a flight instruction, however, the prosecutor could and would have made the same argument. Moreover, even after Miklo split up with defendant, defendant still did not contact his family for over 24 hours. The prosecutor quite properly argued that this was additional evidence of absence of duress. Giving a flight instruction would not have changed anything about the jury's evaluation of this evidence.

We therefore conclude that the failure to give a flight instruction was harmless error.

Defendant asks us, if we find more than one error, to consider their cumulative prejudicial effect. In part III, *ante*, we held that the trial court erred by refusing to give CALCRIM No. 224. In this part, we hold that it erred by failing to give a flight

---

[8] Defendant testified that Valverde agreed to go to the field. However, he also testified that, at the AutoZone, Valverde changed his mind, and he (defendant) kicked him in the groin to get him moving again. As a result, neither consent nor a reasonable belief in consent was really a viable defense.

29

instructions. However, we know for a fact that the refusal to give CALCRIM No. 224 did not affect the jury's verdict. We also know it is not reasonably probable that the failure to give a flight instruction could have been prejudicial. Thus, there could be no cumulative prejudice.

V

ABILITY TO PAY A $10,000 RESTITUTION FINE

Defendant contends that the trial court erred by imposing a $10,000 restitution fine, the statutory maximum, without holding a hearing on his ability to pay and without sufficient evidence of his ability to pay.

A.      *Additional Factual and Procedural Background.*

At the time of sentencing, defendant was 32 years old. The trial court found, "The defendant is indigent." It expressly declined to impose booking fees (Gov. Code, § 29550) or presentence investigation costs (Pen. Code, § 1203.1b). It also did not impose a court facilities assessment (Gov. Code, § 70373) or a court operations assessment (Pen. Code, § 1465.8, subd. (a)(1)). However, it did impose a restitution fine of $10,000. (Pen. Code, § 1202.4.) It also awarded victim restitution of $5,020.89.

Defense counsel objected that defendant lacked the ability to pay the restitution fine. The trial court said, "He looks healthy to me. I think he's going to be working in prison. Does he have any kind of illness?"

Defense counsel responded, "He doesn't. . . . [T]he wages are really low. I think there's some limitation of their income within the next year. . . . He's going to be in

30

maximum security, level four. He's not going to have the opportunity to work for some time because he's not going to be in the right classification to work."

The trial court nevertheless adhered to its ruling.

B.    *Discussion*.

Defendant relies on *People v. Dueñas* (2019) 30 Cal.App.5th 1157 (*Dueñas*), which held that due process and equal protection prohibit the imposition of a criminal restitution fine in the absence of a finding, following a hearing, that the defendant has the ability to pay. (*Id*. at pp. 1160, 1164-1172.)

Preliminarily, we conclude that the People have forfeited three issues.

First, the People do not argue that we should not follow *Dueñas*. The validity of *Dueñas* is currently pending before our Supreme Court. (*People v. Kopp* (2019) 38 Cal.App.5th 47, review granted Nov. 13, 2019, S257844.) In *People v. Taylor* (2019) 43 Cal.App.5th 390, this court followed *Dueñas*, because the People had not argued that we should not. (*Taylor*, *supra*, at pp. 397-399.) In this case, the People once again do not argue that we should not follow *Dueñas*. Under *Taylor*, then, we treat any such argument as forfeited.

Second, the People do not argue that defendant had the burden of proving inability to pay. *Dueñas* held that the prosecution has the burden of proving ability to pay. (*Dueñas*, *supra*, 30 Cal.App.5th at pp. 1160, 1173.) Following the approach in *Taylor*, then, we treat this argument, too, as forfeited.

31

Third, the People do not argue that *Dueñas* does not apply to persons who, like defendant, have been sentenced to life in prison without the possibility of parole. In *Dueñas* itself, the defendant had been placed on probation. (*Dueñas*, *supra*, 30 Cal.App.5th at p. 1162.) The court was concerned, as a matter of due process, with the "potentially devastating" civil and criminal consequences of failure to pay. (*Id*. at pp. 1167-1168; but see *People v. Aviles* (2019) 39 Cal.App.5th 1055, 1069-1072 [ability to pay issue should be analyzed under the excessive fines clause, not the due process clause].) In this respect, a prisoner incarcerated for life is not similarly situated to a probationer released back into society. Nevertheless, again following *Taylor*'s approach, we treat this argument as forfeited.

Defendant argues that he was denied an ability-to-pay hearing. As a result of defense counsel's objection, however, he *did* have a hearing on this issue. Defense counsel presented argument. He did not ask to present any evidence at that hearing and did not request a continuance in order to do so. The trial court proceeded to make a finding of ability to pay, based on defendant's ability to earn wages in prison. Defense counsel did not object that this was not a sufficient hearing.

More to the point, defendant also argues that the trial court's finding of ability to pay was not supported by sufficient evidence.

"[Defendant]'s ability to pay includes '[his] ability to obtain prison wages . . . .' [Citations.]" (*People v. Cervantes* (2020) 46 Cal.App.5th 213, 229.) Although "every able-bodied prisoner" must work (Pen. Code, § 2700), "[a]n inmate's assignment to a

32

*paid* position is a privilege dependent on available funding, job performance, seniority and conduct." (Cal. Code Regs., tit. 15, § 3040, subd. (k), italics added.)

"Prison wages range from $12 to $56 per month, depending on the job and skill level involved. [Citation.] Up to 50 percent of [defendant]'s wages . . . will be deducted to pay any outstanding restitution fine, plus another 5 percent for the administrative costs of this deduction. [Citations.]" (*People v. Cervantes*, *supra*, 46 Cal.App.5th at p. 229.) Likewise, up to 50 percent of his wages will be deducted to pay the victim restitution, plus another 5 percent for administrative costs. (Cal. Code Regs., tit. 15, § 3097, subd. (c).)

The People presented no evidence that defendant was sufficiently skilled to earn more than the minimum $12 a month. They also presented no evidence that he was likely to obtain a paid rather than an unpaid position.

Even if we assume that defendant will be paid $12 a month, he could pay only $5.40 a month (see *People v. Taylor*, *supra*, 43 Cal.App.5th at p. 402) toward the restitution fine and $5.40 a month toward victim restitution. At that rate, it would take him more than 77 years just to pay the victim restitution, and at that point, he would still owe $4,900 of the restitution fine. Thus, there was no evidence that defendant could pay the restitution fine during his natural life.

Accordingly, we will reverse, solely with respect to the restitution fine, and remand for a new ability-to-pay hearing.

## VI

## DISPOSITION

The order imposing a restitution fine is reversed; in all other respects, the judgment is affirmed.  On remand, the trial court must reconsider the imposition and the amount of the restitution fine.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

RAMIREZ          
                                        P. J.

We concur:

McKINSTER          
                   J.

RAPHAEL          
                   J.